STATE, EX REL. RICHARD C. HUNTER, ATTORNEY GENERAL,
PLAINTIFF, V. OMAHA MOTION PICTURE EXHIBITORS ASSO-
CIATION ET AL., DEFENDANTS.

274 N. W. 397

FILED JUNE 26, 1937. No. 30189.

Richard C. Hunter, Attorney General, Francis V. Robin-
son and James T. English, for plaintiff.

Wright, Wright & Kennedy, for defendants.

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE and
CARTER, JJ., and SPEAR, District Judge.

PAINE, J.

This is an original action in the supreme court, in which
the state of Nebraska, on the relation of the attorney
general, as plaintiff, prays that this court will issue a re-
straining order forthwith, which shall serve as a temporary
injunction until a hearing shall be had, at a time to be fixed
by this court, for the purpose of restraining and enjoining
the defendants, their officers, agents, servants, and em-
ployees, from carrying on, promoting, permitting, or allow-
ing within their places of business an illegal lottery, gift
enterprise, or scheme of chance, commonly called "bank
night," and that upon the final hearing the injunction be
made perpetual.

The petition first describes the various corporations and
associations and officers and agents conducting various
moving picture theaters in the city of Omaha, and alleges
that for months past all of the moving picture theaters
now operated in the city of Omaha have been conducting a
lottery, gift enterprise, or scheme of chance in connection
with said theaters, and intend to continue so doing; that

such lottery has been designated as "bank night," and its operation is described in the petition briefly as follows: That a series of registration cards, numbered serially, provide a blank space for the name, address, and telephone number of the registrant; that any person desiring to register fills in the blanks and hands it to an employee of any participating theater; that said cards so filled are filed serially in one card index file, being a record of the individuals who have registered for participation in the weekly drawing; that such blank registration cards are available in the outer lobbies of all participating theaters, and any one can secure a card and fill it in without buying a ticket of admission; that the same serial numbers are printed on small cards, about one inch square, for each of the registration cards, which small cards are placed in a large drum, or receptacle; that Wednesday night of each week is "bank night" at all of the Omaha moving picture theaters.

That a matinee performance is given in all said theaters on Wednesdays, on which afternoon any person who buys a ticket of admission for the matinee prior to 6:00 p. m. may upon request receive a special matinee attendance record, and thereby become eligible to participate in the drawing for that particular night only, whether present at the theater at the time of the drawing or not, and such cards are only provided to those who purchase such admission tickets. Each of said matinee cards has printed upon it: "You are now entitled to participate in tonight's drawing. Should your name be drawn, you will be notified. This card good for tonight's prize only."

On Wednesday evenings, between 8:00 and 9:15 o'clock, during the course of the evening's performance, a large drum or receptacle, containing all of the small one-inch cards, is placed upon the stage of the Orpheum Theater, in full view of the audience, and some disinterested person spins this drum, thereby mixing the cards. The drum is then opened, and one card is drawn therefrom by a blindfolded, disinterested person, usually a child. Reference is

immediately made from this small one-inch card to the registration index, and the name of the registrant whose number has been called is identified, and this winner's name and address are telephoned to every moving picture theater in Omaha, and then announced from each stage. The winner is notified that unless he has signed a matinee card that day he has three minutes in which to make himself known to an agent of some Omaha theater and claim the prize. At some of these theaters this announcement is made simultaneously from the stage and also in the outer lobby and on the street in front of the theater. In other theaters the announcement is made only from the stage inside the theater. If the winner identifies himself within three minutes, or if he has signed a special matinee card that day, the defendants deliver to him the prize money, which consists of a minimum amount of $1,000 cash. If within the three-minute time limit a winner does not appear, and such winner has not signed and filed a special matinee card, no prize is awarded on that Wednesday night, but $500 is added to the $1,000 and the combined sum of $1,500 becomes the prize the following week, and in like manner the prize money is pyramided every week until a winner receives it under these rules, and then the defendants again put up a $1,000 prize for the next ensuing Wednesday night. If the winner whose name is announced is outside of said theater and presents himself within the three-minute limit, he is permitted to enter the theater and claim and receive the prize money without buying an admission ticket.

That on each Wednesday all Omaha theaters display large signs, posters, banners, lighted displays, carrying the words "Bank Night," thereby holding out as a chief inducement for patronage such lottery drawings to be conducted that night; that large signs and small signs are displayed near box office windows, urging prospective patrons to "Register now and be eligible for tonight's drawing." That several of these theaters charge a greater admission price on Wednesday than other days; that the

operation of said "bank night" lottery tremendously increases the patronage of the theaters; that on Wednesdays many matinee tickets are sold to those persons who desire to register, but who do not see, or try to see, the picture that is being shown inside.

It is charged that that part of the scheme which in remote and infrequent cases seems to present the possibility of participating in the drawing and winning the prize without being required to buy an admission ticket is, in truth and in fact, a mere subterfuge, skilfully devised and used by the defendants in an attempt to give their enterprise the outward appearance of a lawful enterprise, whereas in the practical operation of the scheme a vast majority do pay in money for their opportunity to participate, and those who do pay in effect pay for whatever chance, if any, those who do not pay have to win.

That many thousands of dollars have been paid out in prize money, and large sums have thereby been gambled, hazarded and lost by thousands of persons who have been induced by the defendants to participate in said lottery, including minors and others who cannot afford to risk their earnings, and that this tends to demoralize the winners and impoverish the losers, and will, if permitted to continue, result in irreparable losses to legitimate business and to the habits and morals of the people which cannot be compensated in money.

That by the operation of said scheme the defendants are wilfully violating the Constitution and statutes of Nebraska, and are maintaining a public nuisance, which directly affects thousands of citizens of Nebraska, because the same "bank night" scheme is being operated in hundreds of theaters all over the state of Nebraska, and is statewide in its scope, so that individual prosecutions would involve plaintiff in a multiplicity of suits, which would not prevent the lawlessness herein described. That all of such suits would be for the purpose of quieting and establishing the same common rights of plaintiff to proceed by criminal prosecution against operators of the

"bank night" scheme, and all of said suits would have a common set of facts and a single question of law for determination. That plaintiff is without adequate remedy at law; that defendants will continue to violate the law and maintain said public nuisance unless enjoined and restrained from so doing, and that a temporary restraining order and a temporary injunction should be issued against the defendants, their agents, officers, servants, and employees, from carrying on and operating said illegal lottery, gift enterprise, and scheme of chance, and that on a final hearing of this cause said injunction should be made permanent.

This petition is positively verified, and in addition two affidavits are attached thereto. One of these affidavits states that the affiant during a period of three weeks visited all motion picture theaters in Omaha, and that the plan is being used in at least 26 theaters in the city of Omaha; that the winning of such prizes by a few people has caused thousands of people to lose thousands of dollars solely as a result of such lottery, gift enterprise, and scheme of chance.

To this petition and showing, the defendants filed a special appearance, objecting to the original jurisdiction of this court over the subject-matter, setting out that the plaintiff has adequate remedy at law by a legal prosecution for the alleged violation of the criminal statute, and also has an adequate remedy at law by an action for injunction brought in the district court for Douglas county, and the petition fails to show why adequate and complete remedy may not be had by action in the district court for Douglas county, and that the operation of the "bank night" plan is not statewide in its scope, but purely local in character; that the operation of said plan is not harmfully affecting the rights and interests of the people generally throughout the state; that the petition fails to show that a public wrong has been committed, and that judgment by this court in this action will not prevent a multiplicity of suits, and that, for the reasons set forth, the court should not

assume original jurisdiction over the subject-matter of this action. This matter being argued to the court, the special appearance of the defendants was overruled, to which the defendants duly except.

The matter coming on further to be heard upon the motion of the plaintiff for a temporary injunction, such motion was also argued at length to the court, and duly submitted.

We will first examine the Constitution and statutes of Nebraska in reference to lotteries and gift enterprises.

Section 24, art. III of the Constitution, reads as follows: "The legislature shall not authorize any games of chance, lottery, or gift enterprise;" followed by the amendment of 1934 on the pari-mutuel racing plan.

The Nebraska law defines lotteries as follows: "Whoever opens, sets on foot, carries on, promotes, makes or draws, publicly or privately, any lottery or scheme of chance, of any kind or description, by whatever name, style or title the same may be denominated or known; or by such ways and means exposes or sets to sale any house or houses, lands, or real estate, or any goods or chattels, cash or written evidences of debt, or certificates of claims or any thing or things of value whatever, shall be fined in any sum not exceeding Five Hundred Dollars." Comp. St. Supp. 1935, sec. 28-962. Then follows the provision exempting pari-mutuel wagering at horse races.

Section 28-965, Comp. St. 1929, provides that gift enterprises are unlawful which include a ticket of admission to any performance where any promise is held out.

In 1850 Mr. Justice Grier, in delivering the opinion in *Phalen v. Commonwealth of Virginia,* 8 How. (U. S.) 163, 12 L. Ed. 1030, said: "The suppression of nuisances injurious to public health or morality is among the most important duties of government. Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole com-

munity; it enters into every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple."

In 5 Pomeroy, Equity Jurisprudence (2d ed.) 4296, sec. 1893, we find this paragraph: "As a public nuisance concerns the public generally, it is the duty of the government to take measures to abate or enjoin it. Hence it follows that the government can obtain an injunction to restrain a public nuisance, without showing any property right in itself. The duty of protecting the property rights of all its citizens is sufficient to warrant issuing the injunction. Therefore, wherever a public nuisance is shown, equity must enjoin it at the suit of the government. 'Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated is a public nuisance.' "

The plan of a "bank night" lottery is not a new thing before the courts of our country. The defendants cite some 13 cases in each of which they say "bank night" plan has been held to be legal and not a lottery. The plaintiff in his brief sets out a very respectable list of cases where the "bank night" lottery plan has been condemned, and answers the defendants by saying that many decisions cited favorable to "bank night" lotteries are based upon constitutional or statutory provisions much narrower than the provisions in the Nebraska Constitution and laws which make all gift enterprises unlawful.

It will be impossible to set out the holdings of all the cases which we have examined.

In *Central States Theatre Corporation v. Patz*, 11 Fed. Supp. 566, decided in the United States district court for the central division of Iowa, it was said: "Conducting in motion picture theater of advertising scheme called 'bank night' *held* to appeal to cupidity of public and spirit of gambling and speculation, to be unfair and contrary to public safety, and to so closely border on conducting of a lottery as not to entitle theater corporation to injunction to restrain interference with operation of scheme."

In *Commonwealth v. Wall*, 3 N. E. (2d) (Mass.) 28, the holdings can be briefly summarized as follows:

"Essence of 'lottery' is chance for a prize for a 'price,' meaning something of value rather than formal or technical consideration which would support contract. * * *

"Game does not cease to be 'lottery' because some or many of players are admitted to play free, if others continue to pay for their chances. * * *

"In determining whether theatre's bank night constituted lottery, test was whether persons paying for admission were paying in part for chance of prize, and not whether it was possible for persons in lobby or on sidewalk to win without paying for admission to theatre."

In *Affiliated Enterprises v. Gantz*, 86 Fed. (2d) 597, we find an opinion which was released December 3, 1936. It was an appeal from the district court of the United States for the northern district of Oklahoma. Suit was brought by the Affiliated Enterprises against Gantz, doing business as the Star Theater. It was heard in the circuit court of appeals for the tenth circuit, with the opinion by Lewis. The "owner of 'bank night' plan consisting of a system for giving away money prizes by lot in places of entertainment open to public on payment of admission fee held not entitled to restrain use of plan by defendant in his theater for purpose of giving away money prizes by lot or chance, since the plan was too closely akin to a lottery to warrant the protection of equity, notwithstanding that no admission charge was to be exacted as a condition to right to participate in the drawing."

In the very able and exhaustive brief of the defendants, we are cited to many cases which have held that "bank night" was not a lottery. Now, whether this plan is unobjectionable, or, on the other hand, is an evasion of the statute, or an avoidance of it, as claimed, is clearly a question of fact as to how the plan works out in actual operation, and whether in the majority of cases there is an actual payment of money for the chance of winning the prize.

If the allegations of the petition shall be sustained by the evidence, then the plaintiff will be entitled to a permanent injunction, based upon our holdings in the past. *State v. Ak-Sar-Ben Exposition Co.*, 118 Neb. 851, 226 N. W. 705; *Id.*, 121 Neb. 248, 236 N. W. 736, where it .was held that a lottery, or any scheme of chance, by whatever name, style, or title, is unlawful; *State v. Heldt*, 115 Neb. 435, 213 N. W. 578; *State v. Chicago, B. & Q. R. Co.*, 88 Neb. 669, 130 N. W. 295.

In our opinion, it will be proper to grant the state a temporary injunction at this time.

TEMPORARY INJUNCTION GRANTED.