The People of Puerto Rico, Plaintiff and Appellant, v. Escambrón Beach Club, Inc., et al., Defendants and Appellees.

No. 8894. Argued April 11, 1944.—Decided June 5, 1944.

732

R. A. *Gómez, Prosecuting Attorney,* and *Fernando Gallardo Díaz, District Attorney of San Juan,* for appellant. *Miguel Guerra Mondragón* and *Rafael Rivera Zayas* for appellees.

MR. JUSTICE SNYDER delivered the opinion of the court.

This is a suit by The People of Puerto Rico to enjoin as a common nuisance the operation by the defendants of a gambling room at the Escambrón Beach Club in San Juan. The People have appealed from an order of the district court denying a preliminary injunction.

There is no dispute that the defendants operate a dance floor, a restaurant, a bar, and some apartments on the first floor of the Escambrón; that these facilities are regularly used by the general public in an orderly manner; and that the so-called game room which is the object of this controversy is on the second floor of the same building.

We begin by pointing out that the question for decision in the proceeding now before us is a narrow one. The complaint alleged that the building in which the gambling took place was near (a) places where military personnel are situated, and (b) residence buildings. But there was no showing on the hearing for a preliminary injunction that the

gambling was conducted in such a manner that it disturbed the peace. Nor was any evidence offered that property rights in these adjacent areas were affected. The People made no effort to prove, in the words of the district court, that "the so-called 'recreation room', 'casino' or 'gambling room' was damaging to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the enjoyment of life or of property, or interfere with the ·free use of the streets". Counsel for the Escambrón concede that if such facts had been established, an injunction should issue in this case to restrain such activities as a common nuisance. But since no proof to that effect was offered at the hearing on the motion for a preliminary injunction, we turn to the question actually before us.

The theory of The People is that the lack of such proof was not fatal, and that it is entitled to an injunction to suppress a common nuisance merely on a showing that the defendants are operating a gambling establishment in an open, continuous, and persistent manner in violation of the criminal law—that, in· short, repeated violations of a criminal statute prohibiting gambling is, without more, a nuisance *per se.*

In order to determine the validity of this theory, we shall assume, although the district court found the contrary, that at the hearing on its motion for a preliminary injunction, The People satisfactorily established that the defendants operated a gambling room at the Escambrón open to the public in which individuals who participated in roulette, dice, and other games· of chance, played those games for money; that the defendants conducted these games in such a manner that they illegally obtained substantial financial benefits therefrom; and that the said games are operated ·in an open, public, notorious, persistent, continuous, and intentional manner, in violation of §299 of the Penal Code.

█ If we are to understand our statutes on this subject, we must first examine briefly the history and development

of the law of common nuisances.[1]   The roots of the concept of public nuisance are deep in the common law and are of ancient origin.   Many state cases contain analytical and historical discussions pointing out that, without reference to subsequent statutory provisions therefor, a public nuisance could as a matter of common law be prosecuted criminally or enjoined in a court of equity, or both.   Most of the modern cases take as their starting point the case of *Mugler* v. *Kansas*, 123 U. S. 623.   There the Supreme Court said at pp. 672–73:

". . . 'In regard to public nuisance,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. . . . In case of public nuisances, properly so called, an indictment lies to abate 'them, and to punish the offenders.   But an information, also, lies in equity to redress the grievance by way of injunction.' 2 Story's Eq. §§ 921, 922.   The ground of this jurisdiction . . . is the ability of courts of equity to give a more speedy, effectual, and permanent remedy, than can be had at law.   They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings.   This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community.   Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury (citing cases)."

While it recognizes the right and duty of an equity court to restrain a public nuisance even in the absence of statutory authority therefor, *Mugler* v. *Kansas* furnishes no answer to the specific question of whether at common law gambling *per se*, when considered in the light of the aforesaid common law background on the subject, may be so enjoined.   How-

---

[1] The expressions "common nuisance" and "public nuisance" are used interchangeably, and are identical in meaning. 124 Am. State Reports 591 at 595.

ever, the cases in state courts on that particular question are legion. The state courts have found no difficulty, for the most part, in upholding the power of an equity court as a matter of common law to restrain as a nuisance continued violations of gambling statutes. Although it is difficult to tell whether he has influenced the cases or whether the cases have influenced him, a widely quoted author states the rule as follows: "Wherever a public nuisance is shown, equity must enjoin it at the suit of the government. Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated is a public nuisance."[2] We list in the margin some of the authorities which have followed that rule, as well as a few which have not gone that far as a matter of common law.[3]

Excellent discussions of the background of the law of nuisances, and the reasons which have motivated common law

---

[2] 5 Pomeroy, Equity Juris., (2d ed.) 1893.

[3] A useful note, found in 91 A.L.R. 316 and 40 A.L.R. 1145, demonstrates the divided state of the authorities on this question. *Pompano Horse Club* v. *State*, 111 So. 801 (Fla., 1927), although not concerned with our particular problem because of its specific statutory provision that operation of a gambling house is a nuisance and may be enjoined, contains an able and exhaustive study of the authorities elsewhere in the absence of statute and under various forms of statutes. *Engle* v. *Scott*, 114 P.(2d) 236 (Ariz., 1941), in spite of the fact that Arizona has only statutory crimes and that only a general nuisance statute identical to ours prevails, holds that gambling is a nuisance *per se; contra, State* v. *Barron*, 15 P.(2d) 456 (Kans., 1932). Other cases granting injunctions under their particular statutes or as a matter of common law are: *State* v. *The Araho*, 289 N.W. 545, 549, 550, 551 (Neb., 1940); *State* v. *Wokan Amusement Co.*, 19 P.(2d) 967, 969 (Okla., 1933); *State* v. *Omaha Motion Picture Exhibitors' Ass'n*, 274 N.W. 397 (Neb., 1937); *State* v. *Multerer*, 289 N.W. 600 (Wis., 1940); *Gullat* v. *State*, 150 S.E. 825, 827 (Ga., 1929); *Enright* v. *Commonwealth*, 225 S.W. 240 (Ky., 1920); *State* v. *Rabinowitz*, 118 P. 1040 (Kan., 1911); *Respass* v. *Commonwealth*, 115 S.W. 1131 (Ky., 1909). See also, Simpson, Fifty Years of American Equity, 50 Harv. L. Rev. 171, 225, 227–8; Statutory Extension of Injunctive Law Enforcement, 45 Harv. L. Rev. 1096, 7; 13 Calif. L. Rev. 64; 39 Mich. L. Rev. 1035, 36; Equity: Power to enjoin criminal nuisance, 8 Corn. L.Q. 371; Injunction versus Indictment, 8 Fordham L. Rev. 237, 244; Restatement of the Law of Torts, Ch. 40, pp. 216–7; Miller on Criminal Law, 1132, p. 418; 19 Mich.L.Rev. 449–450.

courts to enjoin certain activities, such as the operation of gambling houses, even in the absence of statutory authorization therefor, are found in *People* v. *Vandewater*, 164 N. E. 864 (N. Y., 1928), and *State* v. *La Crosse Theaters Co.*, 286 N. W. 707 (Wisc., 1939).

It remains only to note that many of these cases were or are now governed by statutes either (*a*) granting generally the power to restrain public nuisances, or (*b*) providing specifically for such power for gambling activities. Under a statute couched in terms specifically making the operation of a gambling house enjoinable as a public nuisance, no difficulty, of course, presents itself to a court which is asked for an injunction on a mere showing of open and continuous gambling on the premises involved, without further proof, such as interference with property rights or disorderly conduct. There is less warrant for such relief on such a showing where the statute is general, providing simply for injunctive relief to suppress a common nuisance. But it is important to note, for reasons to be hereinafter developed, that, whether the statute be special or general, the courts in construing such statutes almost invariably assert that such legislative action is merely declaratory of the common law.

How does all this case law on public nuisances and the statutes declaratory thereof affect us in Puerto Rico? We of course, do not share the common law background on this subject with the states in question. And the situation it purports to cover, so far as we have been able to ascertain, has no counterpart in the civil law. Moreover, there can be no prosecution in Puerto Rico for a common law crime. All our crimes are statutory. We must therefore approach with extreme caution any doctrine founded on such common law notions.

Turning to the statutes which have been passed in this jurisdiction in response to these common law influences, we find that §§329 and 330 of the Penal Code and §§277 and

686 of the Code of Civil Procedure are pertinent to the problem under consideration. Those Sections read as follows:

"§ 329.—That anything which is injurious to health, or is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal or basin, or any public park, square, street or highway is a public nuisance; *Provided,* That the emission of smoke from useful manufacturing enterprises except in municipalities of Class I shall not be regarded or treated as a public nuisance unless it is made affirmatively to appear to the court by proof that the health of a considerable number of persons is injuriously affected thereby; *Provided, further,* That nothing in this Act shall be construed as prohibiting the municipal council of all the municipalities of the Island from passing municipal ordinances requiring said manufacturing enterprises to use and employ devices to prevent the unnecessary emission of smoke, cinders and soot, to the injury and prejudice of the inhabitants in cities and towns, and nothing in this Act shall be construed as exempting the owners of said manufacturing establishments from liability for violation of such municipal ordinances.

"§ 330.—Every person who maintains or commits any public nuisance, the punishment for which is not otherwise prescribed, or who wilfully omits to perform any legal duty relating to the removal of a public nuisance, is guilty of a misdemeanor."

"Section 277.—Anything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. Such action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

"Section 686.—An injunction may be granted, upon the petition of the People of Porto Rico, to enjoin and suppress the keeping and maintenance of a common nuisance. The petition shall be verified

by the fiscal of the district in which the common nuisance exists, or by the Attorney General, upon information and belief, and no bond shall be required.''

It therefore becomes our duty to determine (a) whether §686 gives the courts *carte blanche* to suppress what the courts in that independent and unfettered judgment conceive to be a common nuisance; (b) or rather, whether the purpose of the Legislature in enacting §686 was primarily procedural and jurisdictional, in order to enable our courts to exercise in this type of case the equity jurisdiction traditionally exercised by the courts in continental United States. If this latter theory be the correct one, then of course no substantive legal content flows from the use of the words ''common nuisance'' in §686; and instead, resort must be had to the carefully restrictive definitions of a common nuisance found in §329 of the Penal Code and §277 of the Code of Civil Procedure to determine if an injunction to restrain a common nuisance will lie in a particular case.

The problem is one of first impression in this jurisdiction. It is another in the series of our never-ending task of interpreting the intent of the Legislature. The point is an exceedingly close one and is by no means free from doubt. If our heritage were the common law, we might well find, as have the majority of state courts, that the statutes before us are merely declaratory of the common law; that §§329 and 277 therefore do not include within them all the possible categories of public nuisances; but that, on the contrary, the general statutory provision of §686 that ''An injunction may be granted . . . to enjoin . . . a comon nuisance. . .'' imports into this jurisdiction the entire common law background of nuisance.

But this court has before it only the statutes defining a nuisance, which may be punished criminally or enjoined civilly, or both. It would, indeed, represent a long leap into the dark if we were to hold that those statutes also contain within them the vague and elastic—varying in some degree

from one jurisdiction to another—concept of a public nuisance which was woven into the fabric of the common law generations ago.

It cannot be doubted that if the Legislature had simply added to §329 or §330 of the Penal Code a provision that: "And an injunction may also be granted to enjoin a public nuisance", no one could argue that such an injunction could be granted on a mere showing of repeated violations of §329 of the Penal Code making gambling a criminal offense, without proof that, in addition, something was being done, to quote the language of both §§329 and 277, "injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property". How then can it be argued that the fact that the statutory authority to bring an injunction suit in the name of The People to restrain a nuisance is found at another place in the Code of Civil Procedure—§686—rather than in juxtaposition with §329 or §277, somehow or other frees The People, in bringing such a suit under §686, from the burden of showing that a nuisance exists as defined in the language we have quoted from §329 and 277? We are aware, as already noted, that a number of state courts have expressed exactly that view; but we regard it as a strained construction of the statutes in question. And that those courts may have had misgivings similar to ours in reaching such a result is shown by their constant reference to the fact that, as so interpreted, such statutes were merely declaratory of the common law, under which operation of a gambling house was a classical example of a nuisance *per se*. Moreover, we note in passing that some of the state courts were not required to face this problem, as their statutes specifically provided that running a gambling house is a nuisance *per se*.

But in this civil-law jurisdiction we cannot take refuge in the comforting statement that in so interpreting

these statutes we would not be enlarging by judicial fiat the area of operations of suppression of criminal conduct by injunction, on the theory that the statutes thus interpreted would merely be declaratory of the common law as applied since time immemorial. We in this jurisdiction, at least on this question, cannot fall back on any preexisting common law as fixing the legal content of these statutes.[4] We must take the statutes as we find them. And from their context alone we can come to no such conclusion as that pressed on us by the government. Rather we find that the most reasonable approach to the problem of correlating the three statutes in question is to use §§329 and 277, defining a public nuisance, as the frame of reference for the power conferred on the courts by §686 to restrain a common nuisance. And as so construed, there must, as the district court found, be a showing of something more than repeated violations of §329 of the Penal Code to warrant issuance of an injunction under §686 enjoining such operations as a common nuisance. Lest we be misunderstood, we emphasize that we do not retreat from the position taken by this court in many cases during the past forty years that our jurisprudence can frequently be enriched by judicious borrowing from the common law. We hold only that in a case as close as this we are constrained to withhold the hand of the courts unless and until a specific legislative mandate is forthcoming. Whatever may be the tradition in common law communities where even the criminal law stems from the common law, for us to construe §686 as proposed by the Government would be for us, under the

---

[4] We are far from holding that a statute copied from state does not carry with it the prior case law of that jurisdiction interpreting the said statute. The contrary is familiar and accepted law in this jurisdiction, and we by no means repudiate it here. But the situation here is somewhat different, as the statutes in question are held in their home states to be declaratory of the common law, both civil and criminal, which never existed here. Under such circumstances, we feel, without laying down an inexorable rule to be applied for all purposes to all cases, that the case law of such states, both prior and subsequent to passage of our statute, must be carefully examined and applied here with extreme caution.

circumstances of this case, to flout a recent warning in a concurring opinion of Mr. Justice Black: "And for judges to rest their interpretation of statutes on nothing but their own conceptions of 'morals' and 'ethics' is, to say the least, dangerous business."[5]

This court has never had occasion until the instant case to pass squarely on the precise question now before us.[6] We have found a passing reference to the legal content of a public nuisance in a dissenting opinion of two Justices which hints at a definition of a public nuisance which is consonant with the result we reach here and which, since it was not directly involved in that case, may or may not have been shared by the other members of the court (*Saldaña et al.* v. *Municipal Council of San Juan*, 15 P.R.R. 36, 53). But of more importance is the later language of Mr. Justice Córdova Dávila, speaking for the entire court in *Estela* v. *Mercado e Hijos*, 44 P.R.R. 542. While again the point before us was not expressly involved in that case, the language used in that case, which we quote in the margin,[7] leaves little doubt that

---

[5] Mr. Justice Black and Mr. Justice Murphy concurring in *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U.S. 661 at 673.

[6] It may perhaps be parenthetically noted that the failure previously to invoke § 686, which has been on the statute books since 1906, in the manner proposed here is in itself of some significance. Penal statutes do not, of course, ordinarily lapse through non-user (*People* v. *Rubert Hermanos, Inc.*, 53 P.R.R. 741, 759). But it apparently has never occurred to former government officials that § 686 has the sweeping effect now being attributed to it. "If there were doubt—which we think there is not—as to the construction which we give to the act . . . that doubt is entirely dispelled by a consideration of the contemporaneous interpretation given to the act by the officials charged with its execution . . ." (*Gunter* v. *Atlantic Coast Line*, 200 U.S. 273, 287).

[7] "Section 277 of the Code of Civil Procedure, which describes what constitutes a nuisance, authorizes any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, to bring an action for its abatement. Section 12 of our Injunction Act reads as follows: 'An injunction may be granted upon the petition of the People of Puerto Rico, to enjoin and suppress the keeping and maintenance of a common nuisance. The petition shall be verified by the *fiscal* of the district in which the common nuisance exists, or by the Attorney General, upon information and belief, and no bond shall be required.'

this court assumed in the *Estela* case that the result we reach here is the correct interpretation of the statutes involved.

The view we take of the instant case has been best expressed in *People* v. *Lim*, 18 Cal. (2d) 872 (1941).[8] Just as in the instant case, the *Lim* case involved a petition by The People to restrain the defendants from continuing to operate a gambling establishment. After tracing the history of public nuisances as crimes at common law and describing under what circumstances equity would enjoin public nuisances at common law, the court says at pp. 877–80:

"It has been recognized that the tendency to utilize the equity injunction as a means of enforcing public policy is a relatively recent development in the law. (Mack, 'Revival of Criminal Equity', (1903) 16 Harv. L. Rev. 389, 392; (1913) 8 Ill. L. Rev. 19; McClintock, *supra*, p. 286). Courts have held that public and social interests, as well as the rights of property, are entitled to the protection of equity. (Cf. *People* v. *Laman*, 277 N.Y. 368 [14 N.E.

"The action brought in this case, for the purpose of abating an allegedly public nuisance, partakes of the nature of a mandatory injunction. In 1905, section 731 of the Code of Civil Procedure of the State of California, which is very similar to section 12 of our Injunction Act, was amended. The amendment provides that an action may be brought in the name of the People of the State of California for the abatement of a public nuisance by the prosecuting attorney for the county, or by the corporation counsel of the city or town where the nuisance exists and that both the county prosecuting attorney and the corporation counsel of the city shall bring the action when it is so ordered by the board of superintendents of the county or by the legislative body of the city or town. Section 12 of our Injunction Act, like the section we have just cited, authorizes an action in the name of the People of Puerto Rico and provides that the petition shall be verified by the district attorney for the district in which the nuisance exists or by the Attorney General. In our opinion it is the People upon the initiative of its legal representatives, who should bring the action for the abatement of the public nuisance, unless special damages have been caused to a private citizen in which case the citizen would have a right of action in accordance with section 277 of the Code of Civil Procedure." (44 P.R.R. 542, 550–51).

[8] We recognize that the California court had less difficulty in interpreting its statutes than we did, in view of the specific statute there that an injunction suit may be brought there by The People to abate a public nuisance, as defined in another section of the Code, the latter being virtually identical with our §§329 and 277. But once that barrier is hurdled, our statutes, as interpreted here, are in exactly the same form as the California statutes, and the *Lim* case is therefore directly in point.

(2d) 439, 443]; *State* v. *Compere*, 44 N.M. 414 [103 Pac. (2d) 273, 276];(1924) 13 Cal. L. Rev. 63.) This development has resulted in a continuous expansion of the field of public nuisances in which equitable relief is available at the request of the state. It has been held, for example, that the legislature may properly define the term 'public nuisance' for the purposes of an equity injunction so as to include activity which was not a nuisance at common law or activity which offends concepts of public policy even though no rights of property are involved. (*Mugler* v. *Kansas*, 123 U.S. 623 [8 Sup. Ct. 273, 31 L. Ed. 205]; and *People* v. *Barbiere*, 33 Cal. App. 770 [166 Pac. 812]; see, 28 Am. Jur. 338, 5 A.L.R. 1474; 22 A.L.R. 542; 75 A.L.R. 1298.) Where a particular activity, such as gambling or horse-racing, has been held to come within the language of a statute defining the term 'public nuisance' for the purposes of equity jurisdiction on behalf of the state, courts have granted injunctions, or indicated that they would grant them, even though the acts were also criminal. (Citing cases). Upon at least two occasions the legislature of this state has passed statutes authorizing an action in equity to enjoin particular activity contrary to the public policy as a 'public nuisance.' Thus, houses of prostitution and houses where narcotics are illegally sold may be enjoined in an action brought by the district attorney of the county in which they are located. . . .

"It must be admitted, however, that the authorities are divided as to whether the expansion of the field of public nuisances in which equity will grant injunctions must be accomplished by an act of the legislature. (See 40 A.L.R. 1145; 91 A.L.R. 315.) Some courts have attempted by judicial action alone to define 'public nuisance' very broadly in order to grant injunctions on behalf of the state. Thus, it has been said that any place where a public statute is continuously flouted constitutes a public nuisance which may be enjoined by the state. (*State ex rel. Vance* v. *Crawford*, 28 Kan. 726, 733 [42 Am. Rep. 182]; 5 Pomeroy, Equity Jurisprudence (1919), p. 4296.) Other courts have flatly stated that a particular form of activity, such as bull-fighting, is so objectionable as to constitute a public nuisance for the purposes of an equity injunction without the aid of a statute (*State ex rel. Atty. Gen.* v. *Canty,* 207 Mo. 439 [105 S.W. 1078, 123 Am. St. Rep. 393, 13 Ann. Cas. 787, 15 L.R.A. (N.S.) 747]; cf. *Stead* v. *Fortner*, 255 Ill. 468 [99 N.E. 680], criticized in 8 Ill. L. Rev. 19.) The courts of this state, however, have refused to sanction the granting of injunctions on

behalf of the state merely by a judicial extension of the definition of 'public nuisance.' . . . The courts have thus refused to grant injunctions on behalf of the state except where the objectionable activity can be brought within the terms of the statutory definition of public nuisance. Where the legislature has felt that the summary power of equity was required to control activity contrary to public policy, it has enacted statutes specifying that such activity constitutes a public nuisance which may be enjoined in an action brought on behalf of the state. We think the proper rule, therefore, and the one to which this state is committed is expressed in the following language from *State* v. *Ehrlick, supra*: 'It is also competent for the Legislature, within the constitutional limits of its powers, to declare any act criminal and make the repetition or continuance thereof a public nuisance . . . or to vest in courts of equity the power to abate them by injunction; but it is not the province of the courts to ordain such jurisdiction for themselves.' . . .

"In addition to the historical precedents which we have considered, compelling reasons of policy require that the responsibility for establishing those standards of public morality, the violations of which are to constitute public nuisance within equity's jurisdiction, should be left with the legislature. 'Nuisance' is a term which does not have a fixed content either at common law or at the present time. (McClintock, *supra*, p. 288; 13 Cal. L. Rev. 63; 23 Cal. L. Rev. 428; 16 Harv. L. Rev. 389, 396.) Blackstone defined it so broadly as to include almost all types of actionable wrong, that is, 'anything that worketh hurt, inconvenience or damage.' (2 Cooley's Blackstone (4th ed. 1899), p. 1012.) We have already referred to those modern definitions which seek to make of equity an additional remedy for the enforcement of the criminal law by defining 'public nuisance' for the purposes of an injunction as any repeated and continuous violation of the law. (5 Pomeroy, *supra*, p. 4296.) In a field where the meaning of terms is so vague and uncertain it is a proper function of the legislature to define those breaches of public policy which are to be considered public nuisances within the control of equity. Activity which in one period constitutes a public nuisance, such as the sale of liquor or the holding of prize fights, might not be objectionable in another. Such declarations of policy should be left for the legislature. . . . " [9]

---

[9] It is interesting to note that in the *Lim* case the actual holding was that the petition stated a cause of action. The court says at p. 882: "Although the defendants' contention that particular allegations of fact are required is

The philosophy behind the *Lim* case has been recently succintly rephrased in *People* v. *Robbin,* 128 P. (2d) 422 (Calif., 1942). There the court said at pp. 422, 23:

". . . In *People* v. *Lim,* 18 Cal. 2d 872, 118 P. 2d 472, 477, the Supreme Court held, in effect, that equitable jurisdiction in such matters must be conferred by the Legislature and should not be assumed by the courts; that the basis for such jurisdiction must be found in the statutes and not by reference to the common-law definitions of a public nuisance; and that in order to confer jurisdiction in such an action, where it is claimed that a particular activity constitutes a nuisance as defined by our statutes, 'sufficient facts must be alleged so that the court may conclude that nuisance exists within the provisions of the statute.' In that case, involving an attempt to restrain the operation of a gambling establishment it was alleged that this gambling house 'draws together great num-

therefore correct, we think that the allegations of the present complaint are adequate as against a general demurrer. The complaint alleges that the gambling house operated by defendants 'draws together great numbers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, creates traffic and fire hazards, and is thereby injurious to health, indecent and offensive to the senses and impairs the free enjoyment of life and property.' Crowds of disorderly people who disturb the peace and obstruct the traffic may well impair the free enjoyment of life and property and give rise to the hazards designated in the statute. In cases of a similar nature, pleadings which are not essentially different from the one here involved have been held to state facts sufficient to constitute a cause of action. . . .'' Similarly, if such facts were alleged and proved, going far beyond mere repeated violations of the criminal statute prohibiting gambling, a cause of action would be stated in this jurisdiction. The district court correctly stated the law in that connection, as the defendants concede, in the following *dictum:* ''There is no doubt that in the light of the clear and definite provisions of § 277 of our Code of Civil Procedure and § 329 of our Penal Code, if The People had established the fact that gambling was taking place in the Escambrón which was damaging to health, indecent, or offensive to the senses or that it interfered with the free enjoyment of certain property so as to hinder the well-being of an entire neighborhood or of a great number of persons, it would have been entitled to the injunction prayed for.'' Under our present statutes it will be seen that the rule is still a fairly flexible one which cannot be stated more specifically than the district court put it. Whether a case is made out under it will always depend on the facts. Each case of this type is bottomed on its facts, and whether to grant an injunction in a particular case rests in the sound discretion of the district court (*The Hecht Company* v. *Bowles, Administrator,*—U. S.—decided February 28, 1944).

bers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, creates traffic and fire hazards, and is thereby injurious to health, indecent and offensive to the senses and impairs the free enjoyment of life and property.' While it was held that in order to be within the jurisdiction of an equitable proceeding for injunction the act in question must constitute a nuisance within the definition of our statute, it was further held that this allegation was sufficient for that purpose as against a demurrer.

"As we view that decision, it holds that the remedy of injunction may not be employed on the mere showing that a gambling game is being conducted on the premises in question, and that further allegations . . . are essential in order to bring the matter within the statutory definition of a nuisance and to confer jurisdiction upon a court of equity. It necessarily follows that if such matters must be alleged they must also be proved in order to support an injuncion issued in such an action."

Other considerations persuade us that the view we have taken of this case is sound. In continental United States many courts have predicated their decisions, at least in part, on the alleged difficulties involved in repeated trials by jury, in order to justify their expansion by judicial interpretation of the types of cases which an equity court will enjoin as a nuisance.[10] But that consideration has no place in this jurisdiction. There is no constitutional requirement here for trial by jury in criminal cases (*Balzac* v. *Porto Rico,* 258 U. S. 298); and the Legislature has provided that misdemeanors, such as violations of the statute prohibiting gambling involved herein, shall be tried without a jury.[10a] Indeed, since both an injunction suit and a criminal case involving the facts of this case would be tried by the court without a jury, it might well be argued that the only purpose of an injunction suit would be to give the defendant two trials before he could be punished—one to determine if an injunction should be issued, and the second, if an injunction is issued, to determine

---

[10] See, for example, *State* v. *Heldt,* 213 N.W. 578, 580 (Neb., 1927).

[10a] If the Government chooses to initiate the proceedings in the district court, the defendant has a right to trial by jury in misdemeanor cases.

if he is guilty of contempt for violating the injunction—and that the only effect of the first trial in an injunction case would be to restate the law and to declare as an academic matter that it applied to the defendants; it would create no new obligation to refrain from committing crime. To put it more plainly, §299 of the Penal Code is itself of an injunctive character; the issuance of an injunction, standing alone, adds nothing to the prohibition of the statute. And the effect of an injunction proceeding herein under the prevailing statutes is weakened even more in view of the uncertainty as to the nature and amount of punishment which may be imposed for contempt in such a proceeding, and as to whether the proceedings are civil or criminal for the purposes of the *quantum* of proof and other matters, such as the privilege against self-incrimination, questions which are as yet not entirely settled in this jurisdiction (Cf. *Germán* v. *District Court, ante,* p. 587, decided May 5, 1944).

Moreover, our present statutes provide a more effective remedy if The People route their cases through the criminal rather than the equity side of the courts. Section 299 of the Penal Code authorizes the issuance of a search warrant to enable police officers to seize all the "implements, apparatus or materials of gaming" found in a gambling house. And the same Section provides that "All articles and property seized under the provisions of this section, except money, shall, upon evidence before the court that such articles and property were used for gaming purposes, be confiscated and destroyed, and all money so seized shall be covered into the Insular Treasury, in the same manner as fines and costs." No such remedy is found in our general statutes providing for injunctions against common nuisances. The Legislature could readily enact an effective general statute, or one addressed specifically to gambling establishments, to authorize the courts to padlock the premises which were used for such illegal purposes and to confiscate the materials seized therein.

But the Legislature has not yet chosen to do so. The Legislature, when it has been so minded, has known how to make clear its will that certain specific types of gambling shall be considered a public nuisance, and that premises used for such purposes shall be padlocked (§3 of Act No. 25, Laws of Puerto Rico, 1935, Special Session, relating to *bolita;* §5 of Act No. 11, Laws of Puerto Rico, 1933, Special Session— passed apparently as a result of the decision of this court in *Cosme* v. *Candelario,* 44 P.R.R. 577—providing that the operation on certain premises of slot machines shall constitute a misdemeanor, "and in case of recidivism in the commission of this offense such premises shall be considered as a public nuisance and the same may be closed by competent authorities").[11]

Although it is abhorrrent to some other communities [12] and the mails cannot be used therefor,[13] our Legislature has provided for a lottery operated by the government, part of the funds of which are devoted to charitable purposes.[14] In addition, such sports as horse races, dog races, and cockfighting are not only permitted here, but under suitable regula-

---

[11] For an excellent discussion of recent statutes in other jurisdictions which have been specifically enacted to provide for padlocking and forfeiture decrees by equity courts in order to cope more successfully with violations of vice and liquor laws, see footnote 5 in 45 Harv. L. Rev. 1096 at 1097. To the same effect, under the National Prohibition Act, see 41 Stat. 314, 23 U.S.C. §§34, 35.

[12] In *State* v. *Robb & Rowley United,* 118 S.W. (2d) 917 (Tex., 1938) the court says at p. 921: "It is doubtless true that lotteries occupy a unique place in the history of legislation against gambling in Texas. Every constitution of our State from 1845 down, has contained provisions against lotteries similar to those in our present constitution. And it is true that no other form of gambling has been thus singled out, and expressly denounced. Various reasons may be assigned for this. Other governments at various times have resorted to lotteries as a means of raising money. And in *Lee* v. *City of Miami,* 121 Fla. 93, 163 So. 486, 101 A.L.R. 1115, it was said that one of the chief characteristics of lotteries is that they infest the whole community, reach every class, prey upon the hard-earned savings of the poor, and plunder the ignorant and simple, whereas, in comparison, other forms of gambling affect only a few individuals. . ."

[13] Title 18 U.S.C.A. §336.

[14] Joint Resolution No. 37, Penal Code p. 216.

tions, spectators are permitted to gamble on the results thereof.[14a]

The situation, in short, is wholly within the province of the Legislature. It can, if it chooses, as it has done for the government lottery, give up the attempt to eradicate entirely such gambling [15] and legalize it in such a way that it will be restricted, regulated, and taxed in the public interest. Or it can, if it wishes to leave unamended the criminal inhibition against gambling found in §299 of the Penal Code, but desires to strengthen the enforcement machinery of the government, enact a statute similar to our *bolita* and slot machine statutes or the National Prohibition statute, specifically providing that premises so used create a public nuisance and may be padlocked. But "the field is one in which legislative rather than judicial action is required." (38 Mich. L. Rev. 279 at 281.) We have no authority to substitute our judgment for that of the Legislature as to the current mores of the community on this subject. We leave the matter where it belongs—in the hands of the Legislature.[16]

Even if we were free to take a different view of the statutes involved herein, we are not impressed by the argument of The People that the pleadings and proof herein compel us to hold that the district court abused its discretion in over-

---

[14a] Act No. 11, Laws of Puerto Rico, 1932, known as the "Racing Act of Porto Rico," as amended by Act No. 17, Laws of Puerto Rico, 1935, Special Session; Act No. 35, Laws of Puerto Rico, 1936 (regulating dog races); Act No. 236, Laws of Puerto Rico, 1942, known as the "New Cock-fighting Act of Puerto Rico".

[15] In providing for the government lottery, the Legislature recited in the preamble of Joint Resolution No. 37 that "Human nature is inclined to enjoy games of chance and our citizens cannot be prevented from spending their money on lottery tickets of other countries; . . ."

[16] We are not unmindful of the fact that to permit the operations alleged herein leads the defendants to violate the law in many ways. They may not have a license to operate; they may not pay income or other taxes; there may be a disillusioning and perhaps corrupting influence on the police stationed in the neighborhood and their superiors. The situation is perhaps akin to that of the dying days of prohibition. But this only emphasizes the necessity of legislative action in one direction or the other.

ruling the motion for a preliminary injunction (*Fernández* v. *Buscaglia, Treas.,* 60 P.R.R. 582, 589). Even assuming that a breakdown in the enforcement of the criminal law would justify injunctive relief herein,[17] there was no such showing here. On the contrary, there was proof only of two isolated prosecutions, in neither of which were the defendants convicted. This is scarcely the vigorous and determined prosecution of such establishments which should be first initiated before any such failure should be confessed. As already pointed, §299 of the Penal Code gives the government powers to confiscate gambling implements and apparatus—powers which cannot be exercised in the present proceeding for an injunction to restrain a common nuisance. If, as the government asserts, this is a test case which will control other pending injunction suits against such well-known places in San Juan as The Condado Hotel, The Normandie, and Jack's Club, apparently a fairly general condition exists, at least in San Juan, whereby such establishments operate daily and openly in violation of our criminal statutes. One or two acquittals in criminal cases against one defendant hardly justifies The People in resorting under those circumstances to an equity court which in any event wholly lacks the enforcement devices, such as forfeiture and confiscation, provided for in §299 of the Penal Code. Even in the absence of a specific padlock or nuisance statutory provision directed against gambling houses, it is difficult for us to believe that the government of The People of Puerto Rico, with all the resources which it has at its command, cannot stamp out these practices. Certainly, there is nothing in the record before us to justify any such finding. If these places are as notorious and the gambling as open and brazen as the government contends, we see nothing to prevent the government from making repeated, daily raids on these establishments.

---

[17] "The mere fact that it is difficult to enforce the law is no ground for equitable relief." (13 Calif. L. Rev. 63, 66.)

If nothing else, such raids would take the profit out of these operations, and, to be still more practical, confiscation under §299 of the Penal Code of gambling apparatus which is not being manufactured in these days of war would in itself terminate these practices.

If an effort is made to enforce the criminal law along the lines suggested but this still proves ineffective, it may be that the Legislature will then wish to enact legislative provisions for padlocking and nuisance which The People now ask us to read into the statute. If it so chooses, the Legislature can by a simple statute, as has been done in many, if not most, of the state cases cited to us, easily provide that gambling or any other open, intentional, continuous, persistent violation of law shall be enjoinable as a common nuisance. That is for it to determine.

For the reasons stated herein, the order of the district court denying the motion for a preliminary injunction will be affirmed.

Mr. Chief Justice Travieso did not participate herein.