STATE ex rel. CALLIHAN, County Atty., v. WOKAN AMUSEMENT CO. et al.

No. 20427. Opinion Filed March 7, 1933.

George M. Callihan, County Attorney, and I. L. Harris, for plaintiff in error.

O. A. Cargill, Gomer Smith, Twyford & Smith, and G. Lee Gibbs, for defendants in error.

Byron Kirkpatrick, County Attorney of Tulsa County, W. L. Coffey, A. F. Moss, and H. R. Young, amici curiae.

OSBORN, J. This case was commenced in the district court of Oklahoma county by the state of Oklahoma, on the relation of George M. Callihan, as county attorney, against the defendants, Wokan Amusement Company, the Capitol City Kennel Club, and others, seeking to enjoin the defendants from operating and conducting certain dog races, it being alleged that the system of operation of said races constitutes a species of gambling, inhibited by the laws of the state, and that the maintaining a place and operating and conducting of said races, by reason of the violation of the laws of the state relating to gambling, constitutes a nuisance, and same should be abated by a permanent injunction. A temporary restraining order was issued, and answer having been filed the cause was tried on the merits, resulting in a decree denying said permanent injunction, and dissolving said temporary restraining order.

The system of operation is unique, and the county attorney asserts that it is simply an ingenious way for patrons of the dog races to place bets or wagers upon certain dogs, while the defendants contend that the system has none of the elements that taint it with wagering or betting on the outcome of any particular race.

It appears from the record that a patron pays 75 cents for general admission to the enclosure where the races are held, and that such general admission entitles him to witness all of the races held during that particular performance. It also appears that there are about 3,800 seats in the grand stand, and that unless the patron desires to stand up during the entire performance, he is required to pay in addition the sum of $2 for a reserved seat or $5 for a box. It further appears from the record that each ticket for a reserved seat or box seat has printed thereon certain distinguishing characteristics such as "Issue 1," "Series A A.", "Section A. A.", "Seat No. 3," and on the back of each ticket is a certificate of stock of the par value of 5 cents, certifying:

"This is to certify that the bearer hereof is the owner of ONE share of the capital stock of the Capitol City Kennel Club Inc. Upon the purchase of this stock the purchaser hereby delegates to the board of directors of Capitol City Kennel Club Inc. the power and authority in their discretion, to at any time retire at its purchase price, this or any stock of whatever series then outstanding in said corporation, and upon retirement, to vote the dividends. The foregoing provisions shall be binding upon all subsequent holders of this stock."

It is also shown that these distinguishing marks on the ticket have particular reference to the dogs as they are listed in each race; that under the scheme of operation a patron selects one of the eight dogs which he believes is vested with ability to outrun the other seven dogs in that particular race, and having made such choice, he then selects the reserved seat which is represented by his favorite dog, and if he has chosen wisely and his dog places in the race, he is entitled to certain dividends on his stock which are figured on the basis of the price of the seats, which is $2 or $5, as the case may be, instead of the price of his stock, which is 5 cents. In the event his dog is not successful, he may return his stock to the company and he is guaranteed a dividend of 20 per cent. regardless of the outcome of the race, so that the company pays him six cents upon the return of the stock, however, the price of the seat is not returned.

It appears that eight or nine races are run at each performance; that a reserved seat is good for only one race, so that, strictly speaking, a reserved seat privilege for the entire performance would range from $16 to $45, depending on the number of races and whether the patron has an ordinary seat or a box. In due deference to the management, it might be said that the system as operated does not work so great a hardship upon the patrons for the reason that many of the reserved or box seats which are purchased are never used by the purchaser, in which event a patron is allowed

to retain his seat so long as it is not purchased by someone who has a bona fide intention to sit in it, which rarely happens.

The record shows that a number of witnesses who testified herein purchased several seats during the course of one performance, being prompted either by a desire to change scenery or else by a pecuniary interest in the particular dog representing the seat. The evidence shows that the grand stand is divided into three series of seats and that each series is divided into eight sections; that a printed program is furnished, giving the number of each dog, and if the patron believed that dog No. 1 would win first place, he would buy a reserved seat ticket series A-1; if he believed his dog would run second, he would buy a ticket series B-1, and if he believed his dog would likely run third, he would buy ticket numbered series C-1; that if the patron made the right guess, he would receive his proportionate share of the contributions ($2 for reserved seats and $5 for box seats) made by all other persons who bought tickets in that race who failed to exercise that superior judgment in the selection of the fastest canine in that particular race. Thus it behooves every patron to inform himself in advance of each race as to the pedigree and past performance of the various canine participants in the race, lest, by his lack of information, he choose a seat represented on the race course by an animal symbolizing fidelity instead of fleetness, which error of judgment would be detrimental, not only to his enthusiasm, but also to his finances, when the board of directors meets to "retire" his stock and vote the "dividends." In other words, the total receipts, less 10 per cent. reserved by the management for operating expenses, for that race, would be equally divided among those who bought the right ticket. All those who did not win could sell their five cents worth of stock back to the company and receive a dividend of 20 per cent., or 6 cents.

The defendants claim that the county attorney presented this cause to the district court on the basis of section 1935, C. O. S. 1921 (2187, O. S. 1931), which they say has been suspended by a referendum submitted on August 4, 1914, and that this statute is not operative at this time, and that plaintiff is now precluded from relying upon section 1893, C. O. S. 1921 (2310, O. S. 1931), referring to lotteries. With this contention we cannot agree, for this is not a criminal proceeding, but an application for injunction to abate a nuisance. The only question before this court is whether or not the operation of the dog races constitutes a public nuisance under our statutes. By section 1894, C. O. S. 1921 (2311, O. S. 1931), any lottery is unlawful, and a common nuisance. Section 1893, supra (2310, O. S. 1931), defines a lottery as follows:

"A lottery is any scheme for the disposal or distribution of property by chance among persons who have paid or promised or agreed to pay any valuable consideration for the chance of obtaining such property, or a portion of it, or for any share or any interest in such property, upon any agreement, understanding or expectation that it is to be distributed or disposed of by chance or lot, whether called a lottery, a raffle, or a gift enterprise, or by whatever name the same may be known."

Section 7870, C. O. S. 1921 (11489, O. S. 1931), provides as follows:

"A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

"First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or,

"Second. Offends decency; or,

"Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or,

"Fourth. In any way renders other persons insecure in life, or in the use of property."

This section has heretofore been construed by our courts. An early case is that of James et al. v. State, 4 Okla. Cr. 587, 112 P. 944. In that case the defendants were convicted for operating an exchange for gambling on horse races, and the Criminal Court of Appeals reversed the conviction, but held that the operation of a house for the purpose of enabling persons to place bets or wagers upon horse races is a common gambling house and constitutes a nuisance per se, citing a number of authorities.

In the case of Jones v. State, 38 Okla. 218, 132 P. 319, in an opinion by Mr. Justice Kane, the following rules are stated:

"By section 2463, Comp. Laws 1909, a public nuisance is a crime against the order and economy of the state, and consists in unlawfully doing any act or omitting to perform any duty required by the public good, which act or omission either (1) annoys or injures the comfort, repose, health, or safety of any considerable number of persons; or (2) offends public decency; or (3) in any way renders life or the use of property uncomfortable.

"By section 2405, Comp. Laws 1909, the maintenance of a public nuisance is made a misdemeanor, and punishable as such.

"Keeping a turf exchange, where persons daily congregate for the purpose of making bets and wagers on horse races run in other states or countries, is, under our statutes, a public nuisance.

"Section 5771, Comp. Laws 1909, provides that an injunction may be granted to enjoin and suppress the keeping and maintaining of a common nuisance, and this remedy is available, notwithstanding the criminal laws of the state, to which the keepers of such places are also answerable, have not first been resorted to."

These decisions are followed in the case of Oklahoma Kennel Club v. State ex rel. Bishop, 155 Okla. 233, 8 P. (2d) 753, in which the court, speaking through Mr. Justice Hefner, said:

"Operating premises for the purpose of conducting dog races on which books are made and where persons congregate daily for the purpose of making bets and wagers on the races run, and where such bets and wages are openly and publicly made in the presence of the persons assembled, is, under our statutes, a public nuisance."

See, also, McNulty v. State, 90 Okla. 267, 217 P. 467.

Thus it will be seen that our court has consistently followed the rule that any place which was kept and operated as a place where gambling is habitually carried on is a public nuisance and subject to abatement by the proper procedure.

The trial court found, under the evidence, that defendants were not keeping or maintaining a nuisance for the reason that the business under their scheme of operation was not gambling. With this finding of the trial court we cannot agree. After examining the record we are convinced that defendants have merely invented an ingenious scheme for the carrying on of what is in fact a simple violation of the law. Defendants' contention that they are operating a business in the nature of a stock exchange is patently contrary to the actual purpose and result of the entire scheme of operation. The $2 for reserved seats or the $5 for a box is in truth and in fact a bet placed upon a certain dog to win first, second, or third place, as the case may be. The selling of a 5 cent stock certificate with the reserved seats thereby attempting to clothe the transaction with the dignity of a stock sale, is a pure and simple subterfuge, and a mild effort to remove some of the odium which would attach to ordinary gambling. It is interesting to note that the so-called 'dividends' declared by the so-called board of directors are not based upon the value of the 5 cents worth of stock, but are based upon the value of the reserved seats.

The trial court found that the purchase of a reserved seat and the purchase of 5 cents worth of stock were separate transactions. The defendants contend that, by reason of the fact that the stock is redeemed with a 20 per cent. dividend in any event, all elements of change are removed from the transaction. We hold that the purchase of the stock has little, if anything, to do with the case in considering the exact nature and purpose of the entire transaction. The certificate of stock, the board of directors, declaration of dividends, and other like terms are used for the simple purpose of dressing up the entire transaction to make it look respectable. In this connection it might be observed that a "scoundrel dressed in the garb of a clergyman is still a scoundrel."

In the case of Horner v. United States, 147 U. S. 449, 37 L. Ed. 237, Mr. Justice Blatchford, in analyzing various cases and applying the principles therein announced to the facts under consideration, and in holding that the transactions under consideration constituted a lottery, used the following language:

"Although the transaction in question was an attempt by Austria to obtain a loan of money to be put into her treasury, it is quite evident that she undertook to assist her credit by an appeal to the cupidity of those who had money. So she offered to every holder of 100-florin bond, if it was redeemed during the first year, 135 florins, if during the second year, 140 florins, and so on, with an increase of 5 florins each year, until the sum should reach 200 florins; and she also offered to the holder, as part of the bond, a chance of drawing a prize varying in amount from 400 florins to 250,000 florins. Every holder of a bond has an equal chance with the holder of every other bond of drawing one of such prizes. Whoever purchases one of the bonds, purchases a chance in a lottery, or, within the language of the statute, an 'enterprise offering prizes dependent upon lot or chance.' The element of certainty goes hand in hand with the element of lot or chance; and the former does not destroy the existence or effect of the latter. What is called in the statute a 'so-called "gift concert"' has in it an element of certainty and also an element of chance; and the transaction embodied in the bond in question is a 'similar enterprise' to lotteries and gift concerts."

In the case of Pompano Horse Club v. State of Florida ex rel. (Fla.) 111 S. 801, 52 A. L. R. 51, it is said:

"When a group of persons, each of whom has contributed money to a common fund and received a ticket or certificate representing such contribution, adopt a horse race the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or affected by the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horse being paid, from the fund so accumulated, more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore receive nothing, that process constitutes a 'game of chance'; and those who buy, sell, or redeem such certificates, for the purposes and in the manner stated, are 'engaged' in such game within the contemplation of section 5639, Rev. Gen. Stat. 1920. The acts just outlined also constitute 'gambling' as defined and prohibited by section 5514, Rev. Gen. Stat. 1920."

In Reinmiller v. State of Florida (Fla.) 111 S. 633, we find a case similar to the one at bar. In that case tickets were sold, called "investment certificates." At any booth one could purchase tickets for $2 apiece on any dog. Only three dogs out of any race could win. They were called, "Straight," "Place," and "Show." When the race was over the "pot" was divided among the "Straight" ticket holders. The court in that case said:

"This cannot be deemed an interest in the dog or an interest in the earnings of the dog. It is plainly the wagering of money upon the result of the contest of the speed of the dog, because whoever buys one of these so-called 'investment certificates' (or in our case 'reserved seats') for $2, thereby stakes the price of the ticket that the dog on which he has bought the ticket will win the race. He has staked his $2 or that $2 against a proportionate share of whatever amount others may in like manner place on some other dog in the race. This is gambling."

We cannot agree with the conclusions of the trial court that the transactions under consideration are free from the taint of wagering and betting on the outcome of the dog races. While the system is unique and ingenious, we are constrained to hold that such system is violative of the expressed public policy of the state. The conducting of a place where such transactions are carried on constitutes a public nuisance, and, proper action having been taken by the county attorney of Oklahoma county to abate the same, it was the duty of the trial court to grant proper relief.

The judgment of the trial court is reversed, with directions to grant a permanent injunction in conformity with the views herein expressed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, BAYLESS, BUSBY, and WELCH, JJ., concur.