EL PUEBLO DE PUERTO RICO, demandante y apelante, *v.* ESCAMBRÓN BEACH CLUB, INC., MIGUEL VIDAL DÍAZ, PRESIDENTE, y LUIS A. PÉREZ, TESORERO, demandados y apelados.

Núm. 8894—*Sometido:* Abril 11, 1944. *Resuelto:* Junio 5, 1944.

762

*R. A. Gómez, Fiscal del Tribunal Supremo* y *Fernando Gallardo Díaz, Fiscal del Distrito de San Juan,* abogados del apelante; *Miguel Guerra-Mondragón* y *Rafael Rivera Zayas,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Éste es un recurso incoado por El Pueblo de Puerto Rico para que se prohiba la operación por los demandados de un salón de juegos de azar sito en el Escambrón Beach Club en San Juan, por constituir un perjuicio público. El Pueblo ha apelado de la resolución de la corte de distrito denegando un *injunction* preliminar.

No existe controversia en cuanto a que los demandados operan un salón de baile, un restaurante, un bar y algunos apartamientos en el primer piso del Escambrón; que estas comodidades son usadas regularmente en forma ordenada por el público en general; y que el llamado salón de juego, objeto de este pleito, está situado en el segundo piso del mismo edificio.

Empezaremos por indicar que la cuestión a decidir en el recurso ante nos es una de campo limitado. La demanda alega que el establecimiento en que se llevan a cabo los juegos está próximo a (*a*) sitios donde acampan fuerzas mili-

tares, y (b) a casas residenciales. Pero no se probó en la vista sobre injunction preliminar que el juego se llevara a efecto en tal forma que alteraba la paz. Tampoco se ofreció prueba de que se perjudicaran derechos de propiedad en las zonas contiguas. El Pueblo no hizo esfuerzo para probar, según dijo la corte de distrito, que "el llamado 'Salón de recreo', 'casino' o 'salón de juegos' sea perjudicial a la salud, o indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, o que interfiriera con el libre uso de las calles". Los abogados del Escambrón admiten que de haberse establecido estos hechos, procedería en este caso el injunction para impedir tales actividades como perjuicio común. Pero ya que en la vista sobre el injunction preliminar no se ofreció prueba a ese efecto, pasaremos a la cuestión realmente ante nos.

La teoría del Pueblo es que la ausencia de tal prueba no es fatal, y que tiene derecho al injunction para suprimir un perjuicio común con la mera demostración de que los demandados operan un establecimiento de juego en forma libre, continua y persistente, en violación de la ley penal— que, en resumen, repetidas infracciones a una ley penal prohiendo el juego constituyen, sin más, un estorbo *per se.*

Para poder determinar la validez de esta teoría, asumiremos, aún cuando la corte de distrito resolvió lo contrario, que en la vista de su moción sobre injunction preliminar, el Pueblo estableció satisfactoriamente que los demandados operan un salón de juego en el Escambrón, abierto al público, en el que las personas que juegan a la ruleta, a los dados y a otros juegos de azar, lo hacen por dinero; que los demandados conducen estos juegos en forma tal que ilegalmente obtienen de los mismos sustanciales beneficios económicos; y que dichos juegos se conducen en forma abierta, pública, notoria, persistente, continua e intencionada, en violación del artículo 299 del Código Penal.

■ Si hemos de comprender nuestras leyes sobre esta materia, debemos primero examinar ligeramente la historia y desarrollo de la ley sobre perjuicios comunes.(¹) Las raíces del concepto "estorbo público" se adentran en el derecho común y su origen es muy antiguo. Muchos casos estatales contienen discusiones analíticas e históricas indicando que, independientemente de disposiciones estatutarias posteriores con tal fin, un estorbo público puede, como cuestión de derecho común, ser perseguido criminalmente o prohibirse ante una corte de equidad, o ambas cosas. Muchos de los casos modernos toman como punto de partida el caso de *Mugler* v. *Kansas*, 123 U. S. 623. En él dice la Corte Suprema a las págs. 672–73:

". . . 'Con referencia a estorbos públicos', dice el Juez Asociado Story, 'la jurisdicción de las cortes de equidad parece ser de época muy remota, y se han seguido con claridad sus huellas hacia atrás hasta el reinado de la Reina Isabel. . . . En casos de estorbos públicos, propiamente dichos, procede una denuncia para eliminarlos y castigar a los delincuentes. Asimismo procede una petición en equidad para eliminar el perjuicio por medio del injunction'. 2 Story's Eq., secs. 921, 922. La razón de esta jurisdicción . . . es la habilidad de las cortes de equidad para otorgar un remedio más rápido, efectivo y permanente, que el que se puede conseguir en ley. No sólo pueden impedir posibles estorbos y antes de que sobrevenga un daño irreparable, si que pueden detener o eliminar aquéllos en progreso, y, mediante el injunction permanente, proteger al público en el futuro contra los mismos; mientras que las cortes de ley sólo pueden llegar hasta los estorbos ya existentes, dejando que actuaciones posteriores sean la causa de nuevos recursos o procedimientos. Esta es una jurisdicción saludable, especialmente cuando un estorbo afecta la salud, la moral, o la seguridad de la comunidad. Aún cuando no se ejercita con frecuencia, indudablemente existe en las cortes de equidad el poder para así proteger al público contra los daños. (se citan casos)."

---

(¹)Las palabras "perjuicio común" y "estorbo público" se usan indistintamente, y su significado es el mismo. 124 Am. State Reports 591, a la pág. 595.

Si bien reconoce el derecho y el deber de una corte de equidad para prohibir un estorbo público, aún en ausencia de autoridad estatutaria para ello, el caso de *Mugler* v. *Kansas* no tiene respuesta a la cuestión específica de si dentro del derecho común puede prohibirse el juego *per se,* al considerarse a la luz de la referida tradición del derecho común sobre la materia. Sin embargo, es copioso el número de casos de cortes estatales sobre dicha cuestión específica. Estas cortes no han encontrado dificultad, en su mayor parte, al sostener el poder de una corte de equidad, como cuestión de derecho común, para prohibir como estorbo la violación continua de estatutos sobre juego. Aun cuando es difícil determinar si él ha influído en los casos o si los casos han influído en él, un autor muy citado expone la regla como sigue: ''Dondequiera que se demuestre un estorbo público, la equidad debe prohibirlo a instancias del gobierno. Todo sitio donde abierta, pública, repetida, continua, persistente e intencionalmente se infrinja una ley, constituye estorbo público.''(²) Anotamos al margen algunos de los casos que han seguido esta regla, así como unos pocos que no han ido tan lejos como cuestión de derecho común.(³)

---

(²)5 Pomeroy, Equity Juiis. (2d ed.) 1893.

(³)Una anotación muy provechosa, encontrada en 91 A.L.R. 316 y 40 A.L.R. 1145, demuestra la situación dividida de las autoridades en cuanto a esta cuestión. El caso de *Pompano Horse Club* v. *State,* 111 So. 801 (Fla., 1927), aunque no tiene nada que ver con nuestro problema específico toda vez que tenía una disposición estatutaria expresa en cuanto a que la operación de una casa de juego es un estorbo y puede prohibirse, contiene un hábil y exhaustivo estudio de las autoridades en otros sitios en donde no hay una ley o tienen varios tipos de leyes. El caso de *Engle* v. *Scott,* 114 P. (2da) 236 (Ariz, 1941), no obstante el hecho de que Arizona tiene solamente delitos estatutarios y que sólo impera un estatuto general sobre estorbos, idéntico al nuestro, resuelve que el juego es un estorbo *per se; en contra, State* v. *Barron,* 15 P. (2d) 456 (Kans., 1932). Otros casos concediendo injunctions bajo sus estatutos específicos o como cuestión de derecho común, son: *State* v. *The Araho,* 289 N.W. 545, 549, 550, 551 (Neb., 1940); *State* v. *Wokan Amusement Co.,* 19 P. (2d) 967, 969 (Okla., 1933); *State* v. *Omaha Motion Picture Exhibitors' Ass'n,* 274 N.W. 397 (Neb., 1937); *State* v. *Multerer,* 289 N.W. 600 (Wis., 1940); *Gullat* v. *State,* 150 S.E. 825, 827 (Ga., 1929); *Enright* v. *Commonwealth,* 225 S.W. 240 (Ky., 1920); *State* v. *Rabinowitz,* 118 P. 1040 (Kan., 1911); *Respass* v. *Commonwealth,* 115 S.W.

Discusiones excelentes sobre la tradición de la ley de estorbos, y las razones que han dado lugar a que las cortes del derecho común prohíban ciertas actividades, tales como la operación de casas de juego, aún en ausencia de autoridad estatutaria para ello, se encuentran en los casos de *People* v. *Vandewater*, 164 N. E. 864 (N. Y., 1928), y *State* v. *La Crosse Theaters Co.*, 286 N. W. 707 (Wisc., 1939).

Resta sólo indicar que muchos de estos casos fueron o son ahora regidos por leyes que o (*a*) confieren generalmente el poder para prohibir estorbos públicos, o (*b*) proveen específicamente tal poder contra las actividades de juego. Bajo un estatuto redactado en términos específicamente permitiendo la prohibición de las casas de juego, como un estorbo público, ninguna dificultad, desde luego, se presenta a una corte de la que se solicita un injunction, al demostrársele únicamente que se juega abierta y continuamente en los establecimientos envueltos, sin ulterior prueba, tal como perjuicio a los derechos de propiedad o conducta desordenada. Existe menos justificación para tal remedio con dicha prueba, cuando el estatuto es general, solamente disponiendo el remedio de injunction para eliminar un estorbo público. Pero es importante indicar, por las razones que más adelante se desarrollarán, que, ya sea el estatuto especial o general, al interpretar tales estatutos las cortes casi invariablemente han afirmado que esa acción legislativa es una mera reexposición del derecho común.

¿De qué manera nos afectan aquí en Puerto Rico toda esta jurisprudencia sobre estorbos públicos y los estatutos que efectúan tal reexposición? Desde luego, aquí no compartimos con los estados en cuestión la tradición del derecho

1131 (Ky., 1909). Véanse también, Simpson, *Fifty Years of American Equity*, 50 Harv. L. Rev. 171, 225, 227-8; *Statutory Extension of Injunctive Law Enforcement*, 45 Harv. L. Rev. 1096, 7; 13 Calif. L. Rev. 64; 39 Mich. L. Rev., 1035, 36; Equity: *Power to enjoin criminal nuisance*, 8 Corn. L. Q. 371; *Injunction versus Indictment*, 8 Fordham L. Rev. 237, 244; *Restatement of the Law of Torts*, Ch. 40, págs. 216-7; *Miller on Criminal Law*, Sec. 132, pág. 418; 19 Mich. L. Rev. 449-450.

común sobre esta materia. Y la situación que contempla abarcar, hasta donde nos ha sido posible determinar, no existe en el derecho civil. Mas aún, en Puerto Rico no se puede procesar a nadie por un delito del derecho común. Todos nuestros delitos son estatutarios. Por tanto, debemos tratar con sumo cuidado cualquier doctrina basada en tales acciones del derecho común.

 Refiriéndonos a los estatutos que se han aprobado en esta jurisdicción en respuesta a estas influencias del derecho común, encontramos que los artículos 329 y 330 del Código Penal y 277 y 686 del Código de Enjuiciamiento Civil, tienen pertinencia al problema bajo consideración. Estos artículos leen como sigue:

"§329.—"Todo lo que fuere perjudicial a la salud, indecoroso u ofensivo a los sentidos, o que obstruyere el libre goce de alguna propiedad de modo que estorbare el bienestar de toda una sociedad o vecindario, o un gran número de personas, o que ilegalmente obstruyere el libre tránsito, en la forma acostumbrada, por cualquier lago, río, bahía, corriente, canal, o cuenca navegable, o por cualquier parque, plaza, calle o carretera pública, constituye un estorbo público (*nuisance*); *Disponiéndose,* que la emisión de humo de las empresas manufactureras útiles, excepto en los municipios de la Clase I, no se considerará ni se tendrá como estorbo público a menos que resulte afirmativamente de la prueba presentada ante la Corte, que afecta perjudicialmente la salud de considerable número de personas; *Disponiéndose, además,* que nada de lo contenido en esta Ley se interpretará en el sentido de que se prohiba a los concejos municipales de todos los municipios de la Isla la adopción de ordenanzas municipales requiriendo que dichas empresas manufactureras usen y empleen medios adecuados para impedir la innecesaria emisión de humo, cenizas y hollín en detrimento y perjuicio de los vecinos de las ciudades y pueblos; y nada de lo contenido en esta Ley se interpretará en el sentido de eximir a los dueños de las expresadas empresas manufactureras de responsabilidad por infracción de dichas ordenanzas municipales.

"§330.—Toda persona que mantuviere un estorbo público, o cometiere algún acto constitutivo de lo mismo y para lo cual no se hubiere prescrito determinada pena, o que voluntariamente dejare

de cumplir algún deber legal, relacionado con la remoción de un estorbo o daño público (*nuisance*), será reo de '*misdemeanor*'."

"Artículo 277.—Todo lo que fuere perjudicial a la salud, indecente u ofensivo a los sentidos, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, constituye una perturbación que da lugar a una acción. Dicha acción podrá ser promovida por cualquiera persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte menoscabado por dicha perturbación; y la sentencia podrá ordenar que cese aquélla así como decretar el resarcimiento de los perjuicios."

"Artículo 686.—Podrá concederse un *injunction* a petición de El Pueblo de Puerto Rico, para prohibir y suprimir la conservación y mantenimiento de un perjuicio común (*common nuisance*). La petición será jurada por el fiscal del distrito en que el perjuicio común (*common nuisance*) exista, o por el Attorney General, según su leal saber y entender, y no será necesaria ninguna fianza."

Por tanto es nuestro deber determinar (*a*) si el artículo 686 otorga a las cortes carta blanca para suprimir lo que éstas según su criterio independiente y sin limitaciones creen constituye un estorbo público; (*b*) o más bien, si el propósito de la Legislatura al aprobar el artículo 686 fué primordialmente procesal y jurisdiccional, con el fin de poner nuestras cortes en condiciones de poder ejercitar en esta clase de caso la jurisdicción en equidad tradicionalmente ejercitada por las cortes en los Estados Unidos continentales. De ser esta última teoría la correcta, entonces, desde luego, no surge ningún significado legal sustantivo del uso de las palabras "perjuicio común" en el artículo 686; y en su lugar, debe recurrirse a las cuidadosamente restringidas definiciones de un perjuicio común encontradas en el artículo 329 del Código Penal y en el artículo 277 del Código de Enjuiciamiento Civil, para determinar si en un caso específico procede un injunction para prohibir un perjuicio común o estorbo público.

El problema es el primero de su clase en esta jurisdicción. Es otro caso en nuestra interminable tarea de interpretar la intención de la Legislatura. El punto es por demás cerrado

y en manera alguna escapa a la duda. Si nuestra herencia fuera el derecho común, podríamos muy bien resolver, como lo ha hecho la mayoría de las cortes estatales, que los estatutos ante nos declaran meramente el derecho común; que por tanto los artículos 329 y 277 no incluyen en ellos todas las posibles categorías de estorbos públicos; pero que, al contrario, la disposición general estatutaria del artículo 686 de que "Podrá concederse un *injunction* . . . para prohibir . . . un perjuicio común. . . . " trae a esta jurisdicción toda la tradición del derecho común en cuanto a estorbos.

Pero esta corte sólo tiene ante sí los estatutos que definen un estorbo, que puede castigarse criminalmente o prohibirse civilmente, o ambas cosas. En verdad, representaría un salto en la oscuridad si resolviéramos que dichos estatutos también contienen en ellos el concepto vago y elástico— que varía en algún grado de una jurisdicción a otra—de un estorbo público, tejido hace generaciones en el telar del derecho común.

No puede dudarse que si la Legislatura hubiera añadido sencillamente al artículo 329 o al 330 del Código Penal una disposición al efecto de que: "Y también puede expedirse un injunction para prohibir un estorbo público", nadie podría argüir que tal injunction podría concederse con la sola demostración de violaciones repetidas del artículo 329 del Código Penal que declara el juego una ofensa criminal, sin prueba de que, además, algo se estaba haciendo, citando el lenguaje de ambos artículos 329 y 277, "perjudicial a la salud, indecoroso u ofensivo a los sentidos, o que obstruyere el libre goce de alguna propiedad de modo que estorbare el bienestar". ¿Cómo puede argüirse entonces que el hecho de que la autoridad estatutaria para iniciar un recurso de injunction a nombre del Pueblo para prohibir un estorbo se encuentre en otro lugar del Código de Enjuiciamiento Civil —Artículo 686—más bien que en yuxtaposición con el artículo 329 o el artículo 277, de algún modo u otro exime al

Pueblo, al iniciar tal recurso bajo el artículo 686, de su obligación de demostrar que existe un estorbo tal cual lo define el lenguaje de los artículos 329 y 277 que hemos citado? Nos damos cuenta, como ya dijimos, que un número de cortes estatales han expresado exactamente ese punto de vista; pero creemos que ello constituye una interpretación forzada de los estatutos en cuestión. Y que dichas cortes pudieron haber tenido recelos similares a los nuestros para llegar a tal resultado, lo demuestra su constante referencia al hecho de que, así interpretados, tales estatutos eran una mera declaración del derecho común, bajo el cual la operación de una casa de juego era un ejemplo clásico de estobo *per se*. Además, indicamos de paso que a algunas de las cortes estatales no se les requirió que confrontaran este problema, toda vez que sus estatutos expresamente disponían que el mantener una casa de juego es un estorbo *per se*.

Pero en esta jurisdicción del derecho civil no podemos ampararnos en la acomodaticia manifestación de que al así interpretar estos estatutos no estaríamos ampliando mediante fíat judicial el campo de operaciones de la eliminación de conducta criminal mediante injunction, bajo la teoría de que los estatutos así interpretados meramente serían declaratorios del derecho común tal cual ha sido aplicado desde tiempo inmemorial. Aquí en esta jurisdicción, por lo menos en cuanto a esta cuestión, no podemos descansar en ley común alguna ya existente que fije el significado legal de estos estatutos.[4] Debemos tomar los estatutos tal cual los encontra-

---

[4] Lejos estamos de sostener que un estatuto copiado de un estado no conlleva la jurisprudencia anterior de esa jurisdicción interpretativa de dicho estatuto. Lo contrario es una doctrina aceptada y usual en esta jurisdicción, y de ninguna manera la repudiamos en este caso. Pero la situación aquí es algo distinta, ya que los estatutos en cuestión han sido interpretados en los estados de donde proceden como declaratorios del derecho común, tanto civil como criminal, que jamás ha existido aquí. Bajo tales circunstancias, es nuestro sentir, sin que por ello sentemos una doctrina inexorable a ser aplicada para todos los propósitos a todos los casos, que la jurisprudencia de tales estados, tanto la anterior como la subsiguiente a la aprobación de nuestro estatuto, debe ser cuidadosamente examinada y aplicada a este caso con gran cautela.

mos. Y de su significado únicamente no podemos llegar a la conclusión que pretende El Pueblo. Por el contrario, encontramos que la manera más razonable de acercarse al problema de intérrelacionar los tres estatutos en cuestión es usar los artículos 329 y 277, que definen un estorbo público, como la fuente de referencia en cuanto al poder conferido a las cortes por el artículo 686 para prohibir un perjuicio común. Y al así interpretarse, debe haber, como la corte de distrito resolvió, una demostración de algo más que violaciones repetidas del artículo 329 del Código Penal para justificar la expedición de un injunction bajo el artículo 686, que prohibe tales operaciones como perjuicio público. Para que no se nos interprete mal, hacemos énfasis en cuanto a que no nos apartamos de la posición asumida por esta corte en muchos casos durante los últimos cuarenta años de que nuestra jurisprudencia puede enriquecerse con frecuencia mediante adquisiciones juiciosas del derecho común. Sólo resolvemos que en un caso tan cerrado como éste estamos constreñidos a detener la mano de las cortes a menos que y hasta que se vislumbre un mandato específico de la Legislatura. Cualquiera que sea la tradición en las comunidades del derecho común donde aún la Ley Penal emana de la ley común, si interpretáramos el artículo 686 de la manera propuesta por El Pueblo, ello equivaldría, dadas las circunstancias de este caso, a burlar una reciente advertencia hecha en una opinión concurrente del Juez Asociado Sr. Black: "Y el fundamentar los jueces su interpretación de las leyes en sus propias ideas de 'moral' y 'ética' únicamente, constituye, para decir lo menos, una práctica peligrosa."[5]

Esta Corte nunca había tenido la oportunidad hasta el presente caso de pasar directamente sobre la cuestión exacta

(5) El Juez Asociado Sr. Black y el Juez Asociado Sr. Murphy concurriendo en *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U.S. 661, a la pág. 673.

que ahora está ante nos.[6] Hemos encontrado de paso una referencia en cuanto al significado legal de un estorbo público en una opinión disidente de dos jueces asociados que sugiere la definición de un estorbo público consonante con el resultado a que aquí llegamos y que, como no estaba envuelta directamente en dicho caso, pudo o no ser de la conformidad de los otros miembros de la corte (*Saldaña* v. *Concejo Municipal de San Juan*, 15 D.P.R. 37, 56). Pero de más importancia es el lenguaje posterior del Juez Asociado Córdova Dávila, hablando a nombre de toda la corte en *Estela* v. *Mercado e Hijos*, 44 D.P.R. 562. Si bien otra vez el punto ante nos no estaba expresamente envuelto en dicho caso, el lenguaje usado en el mismo, que citamos al margen,[7] deja

---

[6] Quizá pueda indicarse entre paréntesis, que el no haberse invocado anteriormente el artículo 686, que ha estado en nuestras leyes desde el 1906, de la manera aquí propuesta, tiene por sí alguna significación. Desde luego, los estatutos penales de ordinario no desaparecen por falta de uso (*Pueblo* v. *Rubert Hermanos, Inc.*, 53 D.P.R. 779, 798). Pero aparentemente nunca se les ocurrió a los anteriores funcionarios gubernamentales que el artículo 686 tiene el efecto general que ahora se le atribuye. ''De existir dudas—que no creemos que las haya—en cuanto a la interpretación que damos a la ley . . . dicha duda se disipa totalmente al considerar la interpretación contemporánea dada a la ley por los funcionarios encargados de ejecutarla . . . '' (*Gunter* v. *Atlantic Coast Line*, 200 U.S. 273, 287).

[7] ''El artículo 277 del Código de Enjuiciamiento Civil, que describe lo que es un estorbo, autoriza el ejercicio de una acción por cualquier persona cuyos bienes hubieren sido perjudicados o cuyo bienestar personal resulte menoscabado por la perturbación o *nuisance*. Nuestra ley de injunction, en su artículo 12, dice así: 'Podrá concederse un injunction a petición de El Pueblo de Puerto Rico, para prohibir y suprimir la conservación y mantenimiento de un perjuicio común. La petición será jurada por el fiscal del distrito en que el perjuicio común exista, o por el Attorney General, según su leal saber y entender, y no será necesaria ninguna fianza.'

''La acción que se ejercita en el presente caso con el propósito de remover un estorbo que se califica de público tiene el carácter de un injunction mandatorio. En el estado de California se aprobó en 1905 una enmienda al artículo 731 del Código de Enjuiciamiento Civil, muy parecida a la sección 12 de nuestra ley de injunction. En esta enmienda se dice que se puede promover una acción en el nombre del pueblo del estado de California para remover un estorbo público, por el fiscal del distrito del condado o por el abogado de la ciudad o pueblo donde el estorbo exista y que tanto el fiscal del condado como el abogado de la ciudad deben iniciar la acción cuando se lo ordene la junta de superintendentes del condado o la autoridad legislativa del pueblo o ciudad. La sección

pocas dudas en cuanto a que esta corte asumió en el caso de *Estela* que el resultado a que aquí llegamos es la interpretación correcta de los estatutos envueltos.

La opinión que tenemos del presente caso ha sido mejor expresada en *People* p. *Lim,* 18 Calif. (2d) 872 (1941).[8] Al igual que en el presente, el caso de *Lim* envuelve una petición por El Pueblo para que se prohibiera a los demandados de seguir operando un establecimiento de juego. Después de seguir la pista hacia atrás de la historia de estorbos públicos como delitos bajo el derecho común y de describir bajo qué circunstancias podría la equidad prohibir los estorbos públicos en el derecho común, la corte dijo a las págs. 877–80:

"Se ha reconocido que la tendencia a utilizar el injunction en equidad como medio de hacer efectiva la política pública, es una evolución de la Ley relativamente reciente. (Mack, 'Revival of Criminal Equity', (1903) 16 Harv. L. Rev. 389, 392; (1913) 8 Ill. L. Rev. 19; McClintock, supra, pág. 286). Las cortes han resuelto que los intereses públicos y sociales, igual que los derechos de propiedad, tienen derecho a la protección de equidad. (Cf. *People* v. *Laman,* 277 N. Y. 368 [14 N. E. (2d) 439, 443]; *State* v. *Compere,* 44 N. M. 414 [103 Pac. (2d) 273, 276]; (1924) 13 Cal. L. Rev. 63.) Esta evolución ha resultado en una continua expansión del campo de los estorbos públicos en el que el remedio en equidad se obtiene a solicitud del estado. Por ejemplo se ha resuelto que la Legislatura puede propiamente definir el término 'estorbo

12 de nuestra ley de injunction, como el artículo que acabamos de citar, autoriza una acción a nombre del Pueblo de Puerto Rico y dice que la petición será jurada por el fiscal del distrito donde exista el estorbo o por el Attorney General. A nuestro juicio, en el caso de un estorbo público es el pueblo el que debe promover la acción a iniciativa de sus represchtantes legales, a menos que se hubiesen ocasionado perjuicios especiales a un ciudadano privado, en cuyo caso éste tendría un derecho de acción de acuerdo con el artículo 277 del Código de Enjuiciamiento Civil." (44 D.P.R. 562, 571–72).

([8])Reconocemos que la Corte de California tuvo menos dificultad para interpretar sus estatutos que la que hemos tenido nosotros, en vista del estatuto específico de ellos en cuanto a que procede un injunction por El Pueblo para eliminar un estorbo público, tal como se define en otra sección del Código, esta última virtualmente idéntica a nuestros artículos 329 y 277. Pero una vez se elimine dicho escollo, nuestros estatutos, al aquí interpretarse, tienen exactamente la misma forma que los estatutos de California, y el caso de *Lim* es por tanto, enteramente aplicable.

público' a los fines de un injunction en equidad como para incluir actividades que no eran un estorbo en el derecho común o actividades que ofenden conceptos de política pública aun cuando no estén envueltos derechos de propiedad. (*Mugler* v. *Kansas,* 123 U. S. 623. [8 Sup. Ct. 273, 31 L. Ed. 205]; y *People* v. *Barbiere,* 33 Cal. App. 770 [166 Pac. 812]; véanse 28 Am. Jur. 338, 5 A.L.R. 1474; 22 A.L.R. 542; 75 A.L.R. 1298). Cuando se ha resuelto que una actividad específica, tal como el juego o las carreras de caballos, cae dentro del lenguaje de un estatuto que define el término 'estorbo público' a los fines de la jurisdicción en equidad a nombre del estado, las cortes han expedido injunctions, o indicado que los expedirían, aún cuando los actos eran criminales también. (Citando casos). Por lo menos en dos ocasiones la Legislatura de este Estado ha aprobado estatutos que autorizan una acción en equidad para prohibir cierta actividad contraria a la política pública como un 'estorbo público'. Así, las casas de lenocinio y los establecimientos donde ilegalmente se expenden narcóticos pueden ser prohibidos en una acción iniciada por el fiscal del distrito en que estén situados. . . .

"Debe admitirse, sin embargo, que las autoridades están divididas en cuanto a que la expansión del campo de los estorbos públicos en el que la equidad expedirá injunctions, debe ser efectuada por acción legislativa. (Véanse 40 A.L.R. 1145; 91 A.L.R. 315.) Algunas cortes han tratado mediante acción judicial solamente de definir el 'estorbo público' ampliamente con el fin de conceder injunctions a nombre del Estado. Así, se ha dicho que cualquier sitio donde un estatuto público es burlado continuamente constituye un estorbo público que puede prohibirse por el Estado. (*State ex rel. Vance* v. *Crawford,* 28 Kan. 726, 733, [42 Am. Rep. 182]; 5 Pomeroy, Equity Jurisprudence (1919), pág. 4296). Otras cortes han manifestado decisivamente que una forma específica de actividad, tal como las corridas de toros, es tan censurable que constituye un estorbo público a los fines de un injunction en equidad sin la ayuda de un estatuto. (*State ex rel. Attorney General* v. *Canty;* 207 Mo. 439 [105 S. W. 1078, 123 Am. St. Rep. 393; 13 Ann. Cas. 787; 15 L.R.A. (N. S.) 747]; *cf. Stead* v. *Fortner,* 255 Ill. 468 [99 N. E. 680], criticado en 8 Ill. L. Rev. 19). Las cortes de este estado, sin embargo, han rehusado sancionar la expedición de injunction a nombre del estado meramente por una extensión judicial de la definición de 'estorbo público'. . . . Las cortes por tanto se han negado a expedir injunctions a nombre del estado excepto cuando la actividad censurable puede traerse dentro de los términos de la defi-

nición estatutaria de estorbo público. Cuando la Legislatura ha creído que el poder sumario de la equidad se necesita para controlar actividades contrarias a la política pública, ha aprobado estatutos especificando que tal actividad constituye un estorbo público que puede prohibirse en una acción traída a nombre del estado. Creemos por tanto que la regla correcta, adoptada en este estado, está expuesta en el siguiente lenguaje de *State v. Ehrlick*, supra: 'También compete a la Legislatura dentro de las limitaciones constitucionales de sus poderes, declarar criminal cualquier acto y hacer la repetición o continuación del mismo un estorbo público . . . o investir a las cortes de equidad con el poder de eliminarlos mediante injunction; pero no es de la incumbencia de las cortes conferirse a ellas mismas tal jurisdicción.' . . . .

"En adición a los precedentes históricos que hemos considerado, razones obligatorias de política requieren que la responsabilidad para establecer dichas normas de moral pública, la violación de las cuales va a constituir estorbos públicos dentro de la jurisdicción en equidad, debe dejarse a la Legislatura. 'Estorbo' es un término que no tiene un significado fijo bien en el derecho común o en la actualidad. (*McClintock*, supra, pág. 288; 13 Cal. L. Rev. 63; 23 Cal. L. Rev. 428; 16 Harv. L. Rev. 389, 396.) Blackstone lo define tan ampliamente como para incluir casi todas las clases de actuaciones incorrectas, es decir: 'Cualquier cosa que pueda lesionar, causar inconveniencia o daño.' (2 Cooley's Blackstone (4ta. ed. 1899), pág. 1012.) Ya nos hemos referido a dichas definiciones modernas que tratan de hacer de la equidad un remedio adicional para la ejecución de la ley penal definiendo el 'estorbo público, a los fines de un injunction como cualquier violación repetida y continua de la ley. (5 Pomeroy, supra, pág. 4296.) En un campo donde el significado de los términos es tan vago e incierto es una función propia de la Legislatura definir aquellas infracciones a la política pública que van a ser consideradas estorbos públicos dentro del control de la equidad. Una actividad que en un período constituye un estorbo público, tales como la venta de licores o el boxeo, puede no ser censurable en otro período. Tales declaraciones de política deben deben dejarse a la Legislatura. . . ."(9)

(9) Es interesante indicar que en el caso de *Lim* la verdadera decisión fué que la petición aducía una causa de acción. La corte dijo a la pág. 882: "Aunque la contención de los demandados de que se necesitan alegaciones específicas de hecho, es por tanto correcta, creemos que las alegaciones de la presente demanda son suficientes frente a una excepción general. La demanda alega que

La filosofía detrás del caso de *Lim* ha sido recientemente repetida sucintamente en el caso de *People* v. *Robbin*, 128 P. (2d) 422 (Calif., 1942). Allí dijo la Corte a las págs. 422, 23:

". . . En *People* v. *Lim*, 18 Cal. 2d 872, 118 P. 2d 472, 477, la Corte Suprema resolvió, en efecto, que la jurisdicción equitativa en tales materias debe conferirse por la Legislatura y no debe asumirse por las cortes; que la base para tal jurisdicción debe encontrarse en los estatutos y no por referencia a las definiciones del derecho común en cuanto a estorbo público; y que con el fin de conferir jurisdicción en tal acción, cuando se alega que una actividad particular constituye un estorbo tal como se define por nuestros estatutos, 'deben alegarse suficientes hechos de manera que la Corte pueda concluir que el estorbo existe dentro de las disposiciones del estatuto'. En dicho caso, que envolvía un intento de prohibir la operación de una casa de juego, se alegó que este establecimiento reúne un gran número de personas desordenadas, altera la paz pú-

la casa de juego operada por los demandados 'reúne un gran número de personas desordenadas, altera la paz pública, reúne a los ociosos y cultiva malos hábitos entre ellos, crea amenazas de fuego y de congestión en el tránsito y es por tanto perjudicial a la salud, indecente y ofensiva a los sentidos e interrumpe el cómodo goce de la vida y de los bienes'. Grupos de personas desordenadas que alteran la paz y obstruyen el tránsito muy bien pueden interrumpir el cómodo goce de la vida y de los bienes y pueden dar lugar a los riesgos designados en el estatuto. En casos de una naturaleza similar, se ha resuelto que alegaciones que no son esencialmente diferentes a la aquí envuelta aducen hechos suficientes para constituir una causa de acción. . . . " Similarmente, de alegarse y probarse tales hechos, yendo más allá de meras repetidas violaciones del estatuto penal prohibiendo el juego, se aduciría una causa de acción en esta jurisdicción. La corte de distrito expuso correctamente la ley sobre ese particular, según admiten los demandados, en el siguiente *dictum*: "No hay duda alguna de que a tenor de las claras y terminantes disposiciones de los Artículos 277 de nuestro Código de Enjuiciamiento Civil y 329 de nuestro Código Penal, si El Pueblo hubiera probado el hecho de que los juegos que se llevaban a efecto en el Escambrón eran perjudiciales a la salud, indecorosos u ofensivos a los sentidos, o que obstruían el libre goce de alguna propiedad, de modo que estorbare el bienestar de toda una sociedad o vecindario, o de un gran número de personas, hubiera tenido derecho al injunction solicitado." Bajo nuestros actuales estatutos puede verse que todavía la regla es una relativamente flexible que no puede exponerse más específicamente que como la expuso la corte de distrito. El que un caso tenga éxito bajo dicha regla dependerá siempre de sus hechos. Cada caso de esta índole oscila en sus propios hechos, y la procedencia de un injunction en un caso específico descansa en la sana discreción de la corte de distrito (*The Hecht Company* v. *Bowles, Administrator*, ____ U. S. ____, resuelto el 28 de febrero de 1944).

blica, reúne a los ociosos y cultiva malos hábitos entre ellos, crea
amenazas de fuego y de congestión en el tránsito y es por tanto
perjudicial a la salud, indecente y ofensivo a los sentidos e interrumpe
el cómodo goce de la vida y de los bienes.' Si bien se resolvió que
para que caiga dentro de la jurisdicción de un procedimiento de
injunction en equidad la actuación en cuestión debe constituir un
estorbo dentro de la definición de nuestro estatuto, más adelante se
resolvió que esta alegación era suficiente a dicho fin frente a una
excepción previa.

"Tal cual enfocamos dicha decisión, la misma resolvía que el
remedio de injunction no puede emplearse por la mera demostración
de que un juego de azar se lleva a efecto en el lugar envuelto, y que
alegaciones adicionales . . . son esenciales con el fin de traer el asunto
dentro de la definición estatutaria de un estorbo y de conferir juris-
dicción a una corte de equidad. Necesariamente surge el hecho de
que si tales asuntos deben alegarse también deben ser probados para
sostener un injunction expedido en tal recurso."

Otras consideraciones nos llevan al convencimiento de que
la posición que hemos asumido en cuanto a este caso es co-
rrecta. En los Estados Unidos continentales muchas cortes
han predicado sus decisiones, por lo menos en parte, en las
alegadas dificultades envueltas en juicios repetidos ante ju-
rado, con el fin de justificar su expansión mediante interpre-
tación judicial de los tipos de casos que una corte de equi-
dad puede prohibir como estorbo.[10] Pero dicha consideración
no tiene lugar en esta jurisdicción. Aquí no hay requisito
constitucional de juicio por jurado en los casos criminales
(*Balzac* v. *Porto Rico*, 258 U. S. 298); y la Legislatura ha
dispuesto que los *misdemeanors*, tales como infracciones a
la ley que prohibe el juego aquí envuelta, deben juzgarse sin
jurado.([10a]) En verdad, toda vez que tanto un recurso de
injunction y un caso criminal que envuelven los hechos de
este caso serían juzgados por la corte sin jurado, muy bien
podría argüirse que el único propósito del recurso de injunc-

---

([10]) Véase, por ejemplo, *State* v. *Heldt*, 213 N.W. 578, 580 (Neb., 1927).

([10a]) Si el Gobierno elige iniciar el procedimiento en la corte de distrito, el
acusado tiene derecho a juicio por jurado en los casos misdemeanors.

tion sería otorgar al acusado dos juicios antes de que pudiera ser castigado—uno para determinar si procede la expedición del injunction, y el otro, una vez expedido el injunction, para determinar si es culpable de desacato por no cumplir con el injunction—y que el único efecto del primer juicio en el procedimiento de injunction sería exponer de nuevo la ley y declarar como cuestión académica que era de aplicación a los acusados; no crearía una nueva obligación para abstenerse de cometer un crimen. Exponiéndolo más claramente, el artículo 299 del Código Penal tiene por sí mismo un carácter de injunction; la expedición de un injunction, por sí sola, nada añade a la prohibición del estatuto. Y aquí el efecto de un procedimiento de injunction bajo los estatutos prevalecientes se debilita aún más en vista de la incertidumbre en cuanto a la naturalza y monta de la pena que pueda imponerse por desacato en tal procedimiento, y en cuanto asi los procedimientos son civiles o criminales a los fines del *quantum* de la prueba y otras materias, tal como el privilegio contra auto incriminación, cuestiones que todavía no se han resuelto enteramente en esta jurisdicción (*Cf. Germán* v. *Corte de Distrito*, ante, pág. 612, resuelto el 5 de mayo de 1944).

Además, nuestros actuales estatutos proveen un remedio más efectivo si El Pueblo llevara sus casos a la sala criminal de las cortes más bien que a la sala de equidad. El artículo 299 del Código Penal dispone la expedición de una orden de allanamiento para autorizar a los funcionarios policíacos a confiscar todos los "implementos, aparatos y materiales de jugar" que pudieran encontrarse en una casa de juego. Y el mismo artículo dispone que "Todo artículo y propiedad embargada según las disposiciones de esta sección, excepción hecha del dinero, será confiscado y destruído al probarse ante la corte que dichos artículos y propiedad se usaban para el juego, y todo el dinero que así se embargare ingresará en el Tesoro Insular, en la misma forma en

que se ingresan las multas y costas.'' En nuestros estatutos generales disponiendo los injunctions contra los perjuicios comunes no se encuentra tal remedio. La Legislatura podría fácilmente aprobar un estatuto general efectivo, o uno dirigido específicamente a las casas de juego, para autorizar a las cortes a clausurar (*padlock*) los lugares usados para tales fines ilegales y confiscar los materiales allí ocupados. Pero la Legislatura no ha optado todavía por hacer eso. La Legislatura, cuando así lo ha tenido en mente, ha sabido la manera de hacer constar claramente su voluntad en cuanto a que ciertas clases específicas de juegos de azar serán consideradas estorbos públicos, y que lugares usados para tales fines serán clausurados (sección 3 de la Ley Núm. 25, Leyes de Puerto Rico, 1935, Sesión Extraordinaria (pág. 153), referente a bolita; sección 5 de la Ley Núm. 11, Leyes de Puerto Rico, 1933, Sesión Extraordinaria (pág. 71), aprobada aparentemente como resultado de la decisión de esta corte en *Cosme v. Candelario*, 44 D.P.R. 599—disponiendo que la operación en ciertos lugares de máquinas traganíqueles constituiría un misdemeanor, ''y en caso de reincidencia en la comisión de este delito se considerará el local como estorbo público y podrá ser clausurado por las autoridades competentes'').[11]

Aunque algunas otras comunidades la censuran[12] y el co-

(11)Para una excelente discusión de estatutos recientes en otras jurisdicciones que han sido expresamente aprobados para disponer la clausura y confiscación por las cortes de equidad con el fin de hacer frente con mayor éxito a las infracciones de las leyes contra el vicio y el licor, véase el escolio 5 en 45 Harv. L. Rev. 1096 a la pág. 1097. Al mismo efecto, bajo la Ley Nacional de Prohibición, véase 41 Stat. 314, 23 U.S.C. §§34, 35.

(12)En el caso de *State* v. *Robb & Rowley United*, 118 S.W. (2d) 917 (Tex., 1938) la corte dice a la pág. 921: ''Indudablemente es cierto que en Tejas las loterías ocupan un lugar único en la historia de la legislación contra el juego. Cada constitución de nuestro Estado desde 1845 a la fecha, ha contenido disposiciones contra las loterías similares a aquéllas contenidas en nuestra actual Constitución. Y es cierto que ninguna otra forma de juego ha sido separada y expresamente denunciada. Pueden apuntarse varias razones para esto. Otros gobiernos en diferentes épocas han recurrido a la lotería como medio de levantar fondos. Y en el caso de *Lee* v. *City of Miami*, 121 Fla. 93, 163 So. 486, 101

rreo no puede usarse para fines de la misma,[13] nuestra Legislatura ha dispuesto el funcionamiento de una lotería operada por El Pueblo, parte de sus fondos a ser destinados a fines caritativos.[14] Además, tales deportes como las carreras de caballos, las de perros y las peleas de gallos no solamente se permiten aquí, si que bajo reglamentación adecuada, se permite a los espectadores apostar sobre el resultado de las mismas.[14a]

La situación, en síntesis, es enteramente de la incumbencia de la Legislatura. Puede, de así elegirlo, tal como ha hecho con la lotería del Gobierno, abandonar la idea de acabar totalmente con el juego [15] y legalizarlo en tal forma que sea restringido, reglamentado y se le impongan contribuciones, en el interés público. O puede, de elegir no enmendar la inhibición criminal contra el juego, encontrada en el artículo 229 del Código Penal, pero si desea reforzar la maquinaria ejecutiva del Gobierno, aprobar un' estatuto similar a los de nuestra bolita y traganíqueles o el estatuto sobre Prohibición Nacional, que expresamente provee que los lugares así usados constituyen un estorbo público y pueden ser clausurados. Pero ''el campo es uno en que se necesita acción legislativa más bien que judicial.'' (38 Mich. L. Rev. 279 a la pág. 281). No estamos autorizados para sustituir nuestro

---

A.L.R. 1115, se dijo que una de las principales características de las loterías es que infestan toda la comunidad, llegan a todas las clases, consumen los ahorros del pobre y saquean al ignorante y al ingenuo, mientras que en comparación, otras formas de juego, sólo afectan a algunos individuos. . . .''

(13) Título 18 U.S.C.A. §336.

(14) Resolución Conjunta Núm. 37, Código Penal, pág. 217.

(14a) Ley Núm. 11, Leyes de Puerto Rico, 1932 (Leyes de 1931–32, pág. 195), conocida como la ''Ley Hípica de Puerto Rico'', según quedó enmendada por la Ley Núm. 17, Leyes de Puerto Rico, 1935, Sesión Extraordinaria (pág. 93); Ley Núm. 35, Leyes de Puerto Rico, 1936 (pág. 247) (reglamentando las carreras de perros); Ley Núm. 236, Leyes de Puerto Rico, 1942 ((1) pág. 1345), conocida como la ''Nueva Ley de Gallos de Puerto Rico''.

(15) Al disponer para la lotería del Gobierno, la Legislatura dijo en el preámbulo de la Resolución Conjunta Núm. 37 que ''La condición humana es propicia a gustar de los juegos de azar y no se puede impedir que nuestros ciudadanos empleen su dinero en billetes de las loterías de otros países; . . .''

criterio por el de la Legislatura en cuanto a las costumbres en boga (*current mores*) de la comunidad sobre este asunto. Dejamos la cuestión donde corresponde—en manos de la Legislatura.[16]

Aún si estuviéramos en libertad de asumir una conclusión diferente de las leyes aquí envueltas, no nos impresiona el argumento del Pueblo de que las alegaciones y la prueba aquí presentadas nos obligan a resolver que la corte de distrito abusó de su discreción al declarar sin lugar la moción de injunction preliminar (*Fernández v. Buscaglia, Tes.*, 60 D.P.R. 596, 604). Aún asumiendo que el caos en la ejecución de las leyes penales justificaría en este caso un remedio de injunction,[17] no hubo prueba a tal efecto. Por el contrario, sólo hubo prueba de dos únicas denuncias, en ninguna de las cuales se condenó a los acusados. Esto escasamente es la vigorosa y determinada prosecución contra tales establecimientos, que debe emprenderse primeramente antes de que se confiese el fracaso. Como ya se ha dicho, el artículo 299 del Código Penal otorga poderes al Pueblo para confiscar los implementos y aparatos de juego—poderes que no pueden ser ejercitados en el presente procediminto de injunction para prohibir un perjuicio común. Si como afirma El Pueblo, éste es un caso de prueba que regirá otros recursos de injunction pendientes contra conocidos lugares en San Juan tales como el Hotel Condado, el Normandie y el Jack's Club, aparentemente una situación general existe, por lo menos en San Juan, mediante la cual tales establecimientos operan diaria y libremente en violación de nuestras leyes

---

[16] Nos damos cuenta del hecho do que el permitir la operación aquí alegada da lugar a que los demandados infrinjan la ley de muchas maneras. Pueden no tener una licencia para operar; pueden no pagar contribuciones sobre ingresos o do cualquiera otra clase; puede haber una influencia desilusionadora o quizás corruptiva sobre la policía asignada a la vecindad y sobre sus superiores. La situación es quizás análoga a aquélla de los últimos días de la prohibición, pero esto sólo enfatiza la necesidad de acción legislativa en una u otra forma.

[17] "El mero hecho de que es difícil ejecutar la ley no es fundamento para el remedio en equidad." (13 Calif. L. Rev. 63, 66).

penales. Una o dos absoluciones en casos criminales contra un acusado escasamente justifica al Pueblo en recurrir bajo tales circunstancias a una corte de equidad que de cualquier modo carece enteramente de los medios de ejecución, tales como la incautación y confiscación, provistos en el artículo 299 del Código Penal. Aún en ausencia de una disposición específica de ley sobre clausura o estorbo dirigida contra las casas de juego, se nos hace difícil creer que el Gobierno de El Pueblo de Puerto Rico, con todos los recursos que tiene a mano, no pueda acabar con estas prácticas. Ciertamente, del récord ante nos nada surge que justifique tal conclusión. Si estos establecimientos son tan notorios y el juego se lleva a cabo de la manera libre y descarada que alega El Pueblo, nada vemos que impida a éste realizar allanamientos repetidos y diarios en estos establecimientos. De no hacer más, estos allanamientos eliminarían la ganancia que producen estas operaciones; y, para ser aún más prácticos, la confiscación bajo el artículo 299 del Código Penal de los aparatos de juego, que no se manufacturan en estos días de guerra, por sí sola acabaría con estas prácticas.

Si se hace un esfuerzo para ejecutar la ley penal a tenor con lo aquí sugerido y ésta todavía demuestra su inefectividad, puede ser que la Legislatura entonces elija aprobar disposición legislativa de clausura y estorbo, las cuales nos pide El Pueblo que injertemos ahora en la ley. De así elegirlo, la Legislatura puede mediante una sencilla ley, como se ha hecho en muchos, si no todos, los casos estatales citados por nosotros, disponer fácilmente que el juego o cualquier otra abierta, intencional, continua y persistente violación de la ley podrá ser prohibida como estorbo público. Toca a ella determinarlo así.

*Por las razones aquí expuestas, la resolución de la corte de distrito declarando sin lugar la moción de injunction preliminar será confirmada.*

El Juez Presidente Sr. Travieso no intervino.